Robert GREEN, Petitioner,

v.

Charles SCULLY, Superintendent of the Green Haven Correctional Facility; Elizabeth Holtzman, District Attorney of Kings County; Robert Abrams, Attorney General of the State of New York, Respondents.

No. 86 CV 2739.

United States District Court, E.D. New York.

Nov. 4, 1987.

Philip L. Weinstein, Legal Aid Soc. (Jonathan M. Kratter, New York City, of counsel), for petitioner.

Elizabeth Holtzman, Dist. Atty. of Kings County (Jonathan M. Gerson, Brooklyn, N.Y., of counsel), for respondents.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Robert Green has petitioned the Court for a writ of habeas corpus. 28 U.S.C. § 2254. Petitioner asserts that the admission into evidence of statements he made to police officers, statements he made to an assistant district attorney, and evidence seized from his apartment, violated the due process clause and his privilege against self-incrimination. U.S. Const. amend. V, XIV.

### FACTS

Petitioner was convicted after a jury trial in Supreme Court, Kings County of two counts of murder in the second degree. N.Y. Penal Law § 125.25 (McKinney 1975). He was sentenced to two consecutive indeterminate prison terms of twenty-five years to life. The convictions were affirmed, and leave to appeal was denied.

This case arises out of the brutal murders of Shirley Williams and her five-year-old daughter, Latisha. Their bodies were discovered submerged in a bathtub full of water inside Shirley's Brooklyn apartment on March 26, 1978. Detective Thomas Byrnes was assigned to investigate the murders. He spoke to Shirley's sister, Dolores, who stated that during a telephone conversation held the previous day, Shirley had told her that petitioner was visiting her.

Byrnes tried, without success, to locate petitioner and his brother, Michael Green, Shirley's former boyfriend, at their mother's residence. Byrnes left his card so that petitioner could call him back, but was told by petitioner's mother's boyfriend that petitioner was avoiding Byrnes to escape arrest on unrelated warrants. On April 17, 1978, at 10:50 a.m., petitioner was arrested by Officer Joseph Zawicki in connection with a burglary. Officer Zawicki took petitioner to the 71st precinct and called Byrnes, whose card he had found on petitioner. Zawicki thereafter read petitioner his *Miranda* rights, and petitioner stated that he would answer questions without an attorney.

Detective Byrnes and his partner, Detective Fred Hazel, arrived at the precinct house at about 2:00 p.m. They asked petitioner a few questions about the murders, and then left him alone in a room. Petitioner escaped through an open window, but was quickly re-arrested by Officer Zawicki.

Byrnes and Hazel then transported petitioner, in handcuffs, to the homicide office at the 68th precinct. Petitioner, who had already complained that Zawicki had beaten him up, now complained that the handcuffs were too tight. The handcuffs were not removed until he arrived at the 68th precinct. Shortly after 4:00 p.m., the officers read petitioner his *Miranda* rights, and he agreed to talk to them.

The first part of the interrogation was not recorded. Officer Byrnes told petitioner that he had accumulated a substantial amount of evidence against petitioner and that petitioner might help himself by making a statement. Byrnes also apparently made reference to the electric chair.[1] Petitioner stated that he had stopped by Shirley Williams' apartment on the day of the murders. He also stated that he had previously suffered from blackouts, one after fighting with his brother, Michael, the other after killing a cat.

---

1. Contrary to Officer Byrnes' suggestion, the offenses for which petitioner was being questioned were punishable by a maximum sentence term of life imprisonment. *See* N.Y.Penal Law § 70.00(2)(a) (McKinney 1975).

Byrnes then left the interrogation room and turned on a tape recorder, which remained activated for the remainder of the interrogation, approximately one hour and twenty minutes. During that time, Byrnes made a few brief visits into the room, but the bulk of the conversation was between petitioner and Hazel.

Initially, petitioner asserted his innocence. Hazel repeatedly told petitioner that he had committed the murders and that there was sufficient evidence to prove it: [2]

> Hazel: [Y]ou are going to jail anyway. Don't you understand that? You going to jail anyway.

Transcript of Interrogation ("Tr."), at A–1.

> Hazel: Robert, Robert, listen man, you know you went into the bathroom and wash your hands after that, ... we got hand prints all over.

Tr., at A–3.

> Hazel: Robert, I have evidence, man. There is evidence.
>
> Petitioner: You have evidence.

Tr., at A–6.

Hazel also asserted that Byrnes believed there was sufficient evidence to convict petitioner:

> Hazel: Robert, look! We wouldn't have come to the house, we wouldn't have been hassling you, we wouldn't of come down to the 71 to pick you up. Don't you understand man, there a whole, that man been doing this job for damn near 20 years. He tells you that he's got you. He's got you, man, believe me, Robert, he's got you. Believe me, he's got you. O.K., would you, would you, take my word for it? He's got you, O.K.?

Tr., at A–6.

Hazel once again indicated that he believed petitioner was guilty:

> Hazel: Because I know, you know I know, that you killed that lady and that baby. I know that, because I checked out the evidence. See, I

wouldn't let them hassle you like that. If I didn't go behind him and check out that evidence. You know, I'm not going to sit up here and have him tell me something, you understand, and say, "Hey man, this is what I got and it might be bullshit." I went behind him. I checked it out myself. I know you did it, and because you did it, I know that you sick. You understand, you see, you see where I'm coming from, man? I know you did it, man.

> Petitioner: No, you don't.
>
> Hazel: I know you did it.
>
> Petitioner: No, you don't. No, you don't.
>
> Hazel: I know you did it, I know you did it, Robert. I know you did it.

Tr., at A–9.

At other times, Hazel assumed a more sympathetic attitude, referring to petitioner, who is black, as "brother," and promising to help petitioner if petitioner would tell the truth:

> Hazel: If you, if you come down, if you come up front and say "Hey man this is what happen, boom, you know, I just lost, I just lost my ... head," or whatever, or whatever happen, what really happen. If you tell me what really happen, man, you tell me what happen, I can help you. But I can't help you....
>
> Petitioner: Help me, how? Help put me in an institution! A mental institution.
>
> Hazel: [Y]ou're going to jail anyway. Don't you understand that! You going to jail anyway.
>
> Petitioner: So what do I have to lose?
>
> Hazel: But there is a chance that you may be able to get out....
>
> Petitioner: How could I ever get out, if I, if I admit to something like this?
>
> Hazel: What happens now, it's what happens in the next couple of hours that is going to help you.

Tr., at A–1.

> Hazel: I don't ... know, what ... is going through your mind. I don't

**2.** The quoted language that follows was taken from a transcript of the interrogation. Errors in the transcript have been corrected.

have the slightest idea. But I'm willing to ask, and I'm trying to give you an out, I'm trying to give you an out, man, but you're talking to me, and you're talking to me, and you're talking in riddles to me.

Tr., at A–3.

Hazel: Robert, you know you ask me, you say "Hey, Freddie, what can you do for me," right? You ask me what do I do for you? What I can do for you man, O.K.? What I can do for you, Robert, is that I can call the D.A., allright, call the D.A. up, and say "Hey listen, this is what the brother said happen, and this is the evidence we got. Allright, and substantiate what he said. O.K., the brother got a problem. Now whether or not you want to believe that, man, is a fact. The brother got a problem, man. What can we do to help him?" And I'm putting myself out on a limb because everybody in there man, just don't give a fuck. I'm the only one in here trying to talk to you, man everyone else out there don't give a fuck about you.

Tr., at A–4.

Hazel: [W]hat I want is the truth here, man, I want the truth. I want to be able to go to the D.A. and tell the D.A., "Listen, this is Robert Green. Allright, the brother says he did it, this is what happen. O.K. this is the evidence that we have. Allright, ... the brother needs help. He is 23 years old, man. For him to spend the rest of his life in an institution isn't going to give him any help."

Tr., at A–5.

Hazel indicated to petitioner that he would help petitioner deal with his family and that of the victims if petitioner confessed. Tr., at A–7 to A–9.

Hazel also told petitioner that Hazel believed he was sick, and that petitioner had not intended to commit the murders when he arrived at Shirley's apartment:

Hazel: You do appear to be sick to me.

Petitioner: I appear to be sick to you? In what way? I'm sick.

Hazel: You are sick.

Tr., at A–9.

Hazel: Listen, Robert you didn't go up there that Saturday, with the intention of killing that child and her mother. You didn't go up there for that reason.

Petitioner: Of course I didn't.

Hazel: You didn't go up for that.

Tr., at A–12.

After petitioner continued to assert his innocence, Hazel became less sympathetic:

Hazel: "I didn't do it, I didn't do it." That's what you want to tell yourself, and you want to believe it, man. You want to believe it because, like you say, if you were in my position I could hate you, and you think that everyone is going to hate you. You can't understand, a brother that doesn't like me. How I'm sitting here. I don't like you, I told you that up front, you can't understand. How, how ... is he going to tell me know he's going to help. He just told me that he didn't like me.

Petitioner: Right.

Hazel: You know?

Petitioner: It doesn't seem logical.

Hazel: I know it doesn't seem logical, man. It doesn't seem logical what went down up there, but it went down.

Tr., at 12.

Hazel: O.K. (inaudible) like you say, what [am I] sitting here for? What ... am I doing? You know, why am I here talking to you, man? You told me that you don't want me, you know, that you don't believe I can help you, that you don't want my help, and if they got you, fuck you. Do your time.

Petitioner: Could we, could we clear in my mind what you talking about, that I lied about? You just ask me about some of the things that I had on, and I explain it to you, and you just ask me about the guy, who, who the guy, who came in, ah, ah, that's what I lied about, oh yes, right as far as you're concerned, I did it, and I'm just sitting here lying right, right, oh yes, I can dig it, yeah, right that's what I lied about. That's what I lied about, right.

Well, I think if you finish with me, you can take me to the cell.

Hazel: Sit down, Robert! You believe in God, Robert?

Petitioner: Yes, I do.

Hazel: You believe in a hereafter?

Petitioner: No, I don't.

Tr., at 13.

Detective Byrnes subsequently entered the room and falsely told petitioner that he had collected evidence that indicated petitioner had committed the murders:

Byrnes: This is from the scene and the palm prints over here, and I examined them under a microscope, and they match, right? Then blood stains that were found here were found here, blood stains and palm prints will match, the blood stains and fingerprints match the blood of the deceased.

Tr., at A–15.

Petitioner then indicated that he was reconsidering his position. Detective Hazel resumed his sympathetic stance:

Petitioner: Allright, allright, the way you all to me, talking, you see talking to me I am all confused, and I don't know what the hell I am going to do.

Hazel: Robert (inaudible).

Petitioner: The way I am looking at it, with you talking to me and you telling me this and this that and the other, it seems like I don't have a choice.

Petitioner: Allright this is what I am going to do. I am going to play your game but I don't got not choice, O.K.? I don't have no choice. He's telling— he's telling me he has evidence against me.

Hazel: Tell me what happened and tell the truth and I will be there with you when the D.A. comes and I will talk, you be sitting right there, I go right down the line, this is no bullshit. I'll go right down the line with you, man. But you got to tell me the truth, Robert. You've got to tell me the truth.

Petitioner: Can I ask you one question? What guarantee do I have, that you can give me as a guarantee, that if I tell you some of the things that you want to hear....

Hazel: No, no, no, see, let's stop right there, Robert. Let's stop right there. O.K. It's not what I want to hear. What I want from you brother is the truth, I want to know what ... happen, so I can sit down with the man and say, "Listen, the brother has told me the truth, this is what happen. What can we do for him?" I'm going to sit there.

Petitioner: What if he tells you there is nothing we can do?

Hazel: Robert, Robert, Robert. Listen to me, there is always something we can do. There is something that we can do. I'm going to be there with you. I'm not going to leave you, I'm not going to walk out here and leave you by yourself, brother I'm going to be here with you. I'm going to go right down the line with you, man. I got to have the truth from you. I got to know what the ... truth is. Tell me the truth, man. That's what I need from you. I told you when we started out here that I wasn't going to promise anything that I couldn't deliver, you understand?

Petitioner: Right.

Hazel: I told you that right now just me and you in here. You tell me the truth. Tell me what happened, then I can (inaudible) then you and I sit down and hey Robert listen let's ask the D.A. for this (inaudible) I'll talk to the D.A. before he talks with you. I'll say, "Let's do this, let's do this for the brother. The brother told me the truth, this is what happened."

Petitioner: O.K. let me sit up here, let me just tell you.

Hazel: Tell me what happen.

Petitioner: Tell you something.

Hazel: Tell me the truth. Tell me what happen.

Petitioner: That I'll probably be ashamed of it for rest of my life.

Hazel: Tell me what happen, Robert.

At first, petitioner spoke of incidents other than the murders. He stated that he had blacked out on several occasions, once

apparently after he killed a Siamese cat. Hazel continued to be supportive:

> Hazel: See, this is what I was talking about before, Robert. You know, the stuff that you're telling me now. I can help you. We can sit down, we can work something out.
>
> Petitioner: Look, please, I got to say this.
>
> Hazel: Talk, talk, go ahead.

Tr., at 22.

> Hazel: What's going to happen now? I'm going to start working for you if what you tell me is going to be the truth, Robert. If you put your faith in me, man, if you trust me.

Tr., at 23.

After stating that the police had beaten him up following his attempted escape earlier that day, petitioner turned to the day of the murders. He stated that he had dropped by Shirley's apartment that morning, and had spent time with Shirley and Latisha. He recalled Shirley's telephone conversation with Dolores, and remembered that Shirley told Dolores that petitioner was visiting her. He also recalled that he used the bathroom.

Petitioner then asserted that he blacked out. When he regained consciousness, he saw blood everywhere, and saw Shirley and Latisha in the bathtub. He attempted to locate the murder weapon in order to hide it, but was unable to find it. He then took a subway train home.

Petitioner stated that he was wearing sneakers, blue dungarees, a red shirt, and a green jacket. He stated that he noticed blood on his sneakers and had subsequently painted them. He stated that he had burned the green jacket, and that the shoes were in his mother's apartment.

During the confession, petitioner cried. Detective Hazel continued to be sympathetic.

> Hazel: That's what I'm saying, like I told you before. I know that when you went up there you didn't go up there to hurt those people.

Tr., at A-30.

Hazel told petitioner that petitioner could get help and that he was still a young man. Tr., at A-31 to A-34. He told petitioner that he still had a future. Tr., at A-35 to A-36. He again offered to assist petitioner in dealing with his family. Tr., at A-48 to A-49. The interview concluded with petitioner telling Hazel that he wanted to help Hazel solve the case.

During the interrogation, petitioner was not handcuffed. He was permitted to use the restroom. He was provided with cigarettes and soda at the close of the interview.

Approximately five hours after the interrogation concluded, petitioner repeated his statements to an assistant district attorney ("A.D.A."). Based on these statements, the A.D.A. and the detectives obtained a search warrant for petitioner's clothing. Pursuant to the warrant, police entered his home and recovered two pairs of sneakers and a green jacket.

In the trial court, petitioner moved to suppress his statement to Hazel, arguing, *inter alia*, that it was involuntary. Petitioner also moved to suppress the statement he made to the A.D.A. as well as the items seized pursuant to the search warrant, arguing that they were fruits of the illegally obtained statement to Hazel. At the suppression hearing, petitioner presented the testimony of Dr. Franklin Klaf, a forensic psychiatrist. Dr. Klaf testified that petitioner had been brainwashed into confessing. The trial court denied petitioner's motion, holding that his statement had been made voluntarily.

Following his conviction, petitioner appealed to the Appellate Division, Second Department, arguing, *inter alia*, that his statements were obtained in violation of the fifth and fourteenth amendments because: (1) they were induced by promises and were thus involuntary, and (2) they were involuntary considering the totality of the circumstances under which they were given. The Appellate Division unanimously affirmed the convictions. *People v. Green*, 102 A.D.2d 873, 477 N.Y.S.2d 304 (2d Dep't 1984). Leave to appeal to the Court of Appeals was subsequently denied. *People v. Green*, 63 N.Y.2d 776, 470 N.E.2d

874, 481 N.Y.S.2d 1029 (1984) (Wachtler, J.). This petition followed.

## DISCUSSION

Petitioner makes a two-pronged attack on the legality of his confession. First, he asserts that it was induced by promises from Detective Hazel, and must therefore be suppressed under *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), and its progeny. Second, he asserts that the statements were made involuntarily, considering the totality of the circumstances. I will address the second argument first.

The fifth amendment's privilege against self-incrimination prohibits the use of a confession against a criminal defendant unless the confession was given voluntarily. *See Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 347–48, 83 S.Ct. 448, 453–54, 9 L.Ed.2d 357 (1963). This privilege applies to the states through the fourteenth amendment. *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492–93, 12 L.Ed.2d 653 (1964).

■ A court considering the voluntariness of a confession should look to "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (dicta). In this proceeding, brought under 28 U.S.C. § 2254, that determination must be made independently of the state court's determination. *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985).

Petitioner argues that many factors in this case mandate a finding of involuntariness. He asserts that Hazel's promises of assistance created in him the hope that he could receive a shorter prison term if he confessed. He also asserts that Hazel's false offers of friendship and minimization of petitioner's culpability undermined petitioner's ability to assert his innocence. Petitioner contends that the officers deceived him when they overstated the strength of their case to him, and that Hazel negated the *Miranda* warning when he ordered pe-titioner to sit down in the interrogation room. Petitioner also notes that his arraignment on the burglary was delayed by the Byrnes–Hazel interrogation. Finally, petitioner asserts that Hazel's "friendliness," when combined with Byrnes' hostility (the so-called "Mutt and Jeff" act) was coercive because it created in petitioner a desire to please Hazel by confessing to the murders.

Having carefully considered these assertions, I conclude that, under the totality of the circumstances, petitioner's argument must be rejected.

■ First, petitioner's personal characteristics do not suggest that his will was susceptible to being overborne. At the time of his arrest, petitioner was twenty-three years old, had been arrested four times as an adult, and had a juvenile record. He had thus extensive contact with the criminal justice system. In addition, there is no intimation that petitioner lacked an education or was of low intelligence. Taken together, these factors suggest that petitioner was not susceptible to being intimidated or fooled by the police, and that he appreciated the nature of the interrogation process and was prepared to deal with it. *See Schneckloth, supra,* 412 U.S. at 226, 93 S.Ct. at 2047 (dicta) (proper to consider defendant's youth, lack of education, or low intelligence). *E.g., United States v. Ferrara,* 377 F.2d 16, 18 (2d Cir.) (defendant who had two prior convictions and "was not uninitiated in the criminal law" did not make involuntary confession), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967).

In addition, the interrogation procedure was not conducted in a coercive manner. The interrogation lasted approximately two hours. Petitioner was permitted to use the restroom. He was neither physically punished nor threatened with force. Hazel's questioning was neither repetitive nor prolonged. Throughout the interrogation, Hazel responded to petitioner's questions. When petitioner indicated that he wished to change the subject, Hazel acceded.

Petitioner correctly asserts that certain elements of the interrogation procedure made his confession more likely than not. In particular, Detective Hazel's repeated promises of assistance and assertions of friendship might have increased the likelihood of a confession. Officer Byrnes' hard-line attitude may have had a similar effect.

Viewed in the totality of the circumstances, however, the officers' conduct did not have a coercive effect. First, petitioner had received his *Miranda* warnings, and thus understood that he was under no obligation to speak with the police. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969). Second, Officer Hazel did not indicate that a confession would affect either the nature of the charge or the length of the sentence. Finally, Officer Byrnes' misrepresentation of the evidence was not, when viewed with all of the circumstances surrounding the interrogation, sufficient to make petitioner's statement involuntary. *See id.* Accordingly, having thoroughly reviewed the record, I conclude that defendant's statement to Officer Hazel was made voluntarily.

■ I now turn to petitioner's argument that his confession was involuntary under *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In *Bram,* the defendant was suspected of murdering the master of an America vessel while it was on the high seas. When the ship arrived in a Canadian port, the crew placed defendant in irons and transported him to a police station, where defendant was held in custody without counsel. The police interrogator ordered defendant to strip, conducted a strip-search, and examined the defendant's clothing. The officer spoke to the defendant, stating " 'Bram we are trying to unravel this horrible mystery.... Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder.' " Bram replied, " 'He could not have seen me. Where was he?' " The officer answered, " 'He states he was at the wheel.' " Bram replied, " 'Well, he could

not see me from there.' " The police officer then stated, " 'Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But, some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' " Bram then said, " 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' " *Id.* at 539, 18 S.Ct. at 185. Defendant's statements were admitted at trial against him, over his objection. He was convicted of first-degree murder and sentenced to death.

The Supreme Court reversed the conviction, holding that defendant's statements should have been suppressed because they were made involuntarily, in violation of the fifth amendment's privilege against self-incrimination. The Court stated:

"[A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence.... *A confession can never be received in evidence where the prisoner has been influenced by any threat or promise;* for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

*Id.* at 542–43, 18 S.Ct. at 187 (ellipses in original) (emphases added) (quoting 3 Russell on Crimes 478 (6th ed.)). Analyzing separately the defendant's two incriminating statements, the Court concluded that defendant's first statement was prompted by a fear that remaining silent would be considered an admission of guilt. *Id.* at 562, 18 S.Ct. at 194. The second statement was prompted by a belief that if he confessed, his sentence would be mitigated. *Id.* at 564–65, 18 S.Ct. at 195–96. In both analyses, the Court evaluated the interrogator's questions and statements, and defendant's responses, in light of the coercive

circumstances surrounding the interrogation. *See id.* at 562–65, 18 S.Ct. at 194–96. *Bram* thus did not hold involuntary any statement made by a criminal defendant subsequent to a promise from a police interrogator.

*Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), indicated that *Bram* was consistent with the totality-of-the-circumstances test because in *Bram* the interrogator's statements had been evaluated in the context of the entire interrogation:

> *Bram* dealt with a confession given by a defendant in custody, alone and unrepresented by counsel. In such circumstances, even a mild promise of leniency was deemed sufficient to bar the confession, *not because the promise was an illegal act as such,* but because defendants at such times are too senstive to inducement and the possible impact on them too great to ignore and too difficult to assess.

*Id.* at 754, 90 S.Ct. at 1472 (emphasis added).

Decisions since *Brady* have used the totality-of-the-circumstances approach in holding admissible confessions made after promises by officials. *E.g., United States v. Ceballos,* 812 F.2d 42, 51 (2d Cir.1987); *Miller v. Fenton,* 796 F.2d 598, 608–13 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *United States v. Mast,* 735 F.2d 745, 749–51 (2d Cir.1984). Petitioner's reading of *Bram,* which is at odds with the analysis used by the courts, is therefore rejected.

For the foregoing reasons, the Court finds that defendant's statement to Officer Hazel was made voluntarily. That statement, the statement petitioner made to the A.D.A., and the evidence seized pursuant to the warrant, were thus properly admitted into evidence at trial.

Accordingly, the petition for a writ of habeas corpus is denied.

SO ORDERED.