**Robert GREEN, Petitioner–Appellant,**

v.

**Charles SCULLY, Superintendent of the Green Haven Correctional Facility, Respondent–Appellee.**

**No. 1031, Docket 87–2491.**

United States Court of Appeals, Second Circuit.

Argued May 2, 1988.

Decided June 20, 1988.

Jonathan M. Kratter, The Legal Aid Soc., New York City (Philip L. Weinstein, New York City, of counsel), for petitioner-appellant.

Kimberly Muradaz, Asst. Dist. Atty., Brooklyn, N.Y. (Barbara D. Underwood, Asst. Dist. Atty., Elizabeth Holtzman, Dist. Atty., Kings County, Brooklyn, N.Y., of counsel), for respondent-appellee.

Before OAKES, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Petitioner Robert Green appeals from the denial in the Eastern District of New York of his application for a writ of habeas corpus, 675 F.Supp. 67. He was convicted of two particularly brutal murders at a jury trial in New York State Supreme Court where the principal evidence against him was his own tape-recorded confession taken during police interrogation.

## FACTS

On Sunday March 26, 1978 23–year-old Shirley Williams and her five-year-old daughter Latisha were found murdered in their Brooklyn, New York apartment. New York City Police Detective Byrnes was assigned to investigate the crime. He went to the scene of the crime where he observed the victims' bodies submerged in a bathtub full of water. He spoke to Shirley Williams' sister, Dolores, who said that Shirley had told her on the telephone that petitioner Green was visiting her the previous day. Byrnes attempted to locate petitioner Green and his brother Michael, Shirley's former boyfriend, at their mother's house. He made several visits to the mother's house without success, finally leaving his card with a message for petitioner to call him. Several weeks later on April 17, 1978 petitioner was apprehended in connection with a burglary by New York City Police Officer Joseph Zawicki. Zawicki took petitioner to the 71st precinct and then called Detective Byrnes, whose card he had found on petitioner. Officer Zawicki gave Green his *Miranda* rights, and Green said that he was willing to answer questions without an attorney being present.

Detective Byrnes and his partner, Detective Fred Hazel, came to the 71st precinct that same afternoon. They first asked petitioner when he had last seen Shirley Williams. When Green responded that he had last seen her a few weeks before he heard she had been killed, the detectives stepped out of the interrogation room to evaluate this statement in light of Dolores Williams' statement that Shirley had said that Robert Green was in her apartment on March 25. When the detectives returned, they discovered that Green had escaped through a window. Within 15 minutes he was recaptured in the neighborhood by Officer Zawicki.

Detectives Byrnes and Hazel then took Green to the homicide office at the 68th precinct, arriving at 3:40 on the afternoon of April 17. At 4:20 p.m. the detectives gave Green his *Miranda* warnings and he agreed to talk to them. The first part of

the interrogation was not recorded, but during the recorded portion petitioner—apparently referring to a threatening statement made by Detective Byrnes before the tape recorder was turned on—said: "you heard what he said about the electric chair." By his recorded answers petitioner also indicated that Detective Hazel had previously questioned him about the clothes he was wearing on the day of the murders and about a man petitioner had said he saw entering Shirley Williams' apartment building just as he was leaving. Detective Hazel further recalled petitioner had admitted during the unrecorded interrogation that he had stopped by the victims' apartment for a few minutes on the day they were killed and conceded that he had lied to the detectives when they asked him about it earlier at the 71st precinct. After petitioner asked to speak to Detective Hazel alone, Detective Byrnes went into another room and turned on a device that allowed him both to hear and record the conversation. The recorder was on continuously for over an hour. Detective Byrnes made brief periodic visits to the interview room during the questioning. It is this recorded confession that constituted the principal evidence against Green at his state trial for the two murders.

Petitioner's assertions of his innocence and Detective Hazel's averments that the police already had all the evidence they needed to convict petitioner dominated the early discussion. The first words spoken by petitioner on the recording are: "Let me ask you a question? Like you said you've get [sic] all the evidence against me." Detective Hazel elaborated on some of the evidence, suggesting that petitioner had gone into the bathroom, washed his hands, and left hand prints. The detective repeated "I have evidence man. There is evidence." Green continued to dispute the detective's claim that they had evidence inculpating him, challenging Detective Hazel to produce some clear fingerprints in blood that could be identified as his. Detective Hazel vouched for the evidence, saying that he had personally "checked it out," and repeatedly asserted his knowledge of Green's guilt:

Hazel: I know you did it. I know you you did it, Robert. I know you did it.
Petitioner: You don't know I did it!

Petitioner insisted that he would never admit to the murders because if he did he would not be able to face his and Shirley's families. Detective Hazel assured Green that he could help in dealing with his family and suggested Green must have been mentally ill when he killed Shirley and Latisha. Detective Hazel and Green are both black and frequently referred to each other as "brother." Hazel expressed sympathy and offered to help saying that he would talk to the District Attorney's office about getting psychiatric help for petitioner. The offer to help was repeated a number of times. For instance, Detective Hazel told petitioner that he would tell the prosecutor that "the brother needs help.... [F]or him to spend the rest of his life in an institution isn't going to give him any help." Later, he added, "you tell me what happen I call the D.A. I get him down here man we get you some help." But the detective also advised Green not to think that he was going to escape responsibility for what he did: "Hey man, you going to go to jail," to which petitioner responded "Some help O.K."

The detective then took a different tack, asking "why am I sitting here talking to you, man? You told me that you don't want me...." Faced with the possibility of Detective Hazel's withdrawal, petitioner sought to continue the conversation:

Could we, could we clear in my mind what you talking about, that I lied about? You just ask me about some of the things that I had on, and I explain it to you, and you just ask me about the guy, who, who the guy, who came in, ah, ah that's what I lied about, oh yes, right as far as you're concerned, I did it, and I'm just sitting here lying right, right, oh yes, I can dig it, yeah, right that's what I lied about. That's what I lied about right, well I think if you finish with me, you can take me to the cell.

The detective apparently construed this statement as an offer to go over once more the details of Green's actions on the day of

the killings; petitioner argued below that the statement was a request to discontinue the interrogation and to return to his cell. The detective told Green, who had gotten up from his chair—as he had several times earlier—to "sit down!" Green then related how he went to Shirley's house after his plans to visit with a friend in the neighborhood fell through.

Detective Byrnes entered the room and said,

> This is from the scene and the palm prints over here, and I examined them under a microscope, and they match, right! Then blood stains that were found here were found here, blood stains and palm prints will match, the blood stains and fingerprints match the blood of the deceased.

In fact, it was clear at trial that Green's palm prints and his fingerprints did not match those taken from the victims' apartment. Detective Hazel admitted that he did not know the results of the fingerprint comparisons during his questioning of Green. Before leaving the room, Detective Byrnes told Green that Detective Hazel had compassion for him because Hazel was inexperienced while he, Byrnes, did not care about petitioner.

Green then began to consider cooperating. He asked what guarantee he would have if he were to "tell [Hazel] some of the things that [he] want[ed] to hear." Detective Hazel replied, "No, no, no, see, let's stop right there Robert, let's stop right there. O.K. It's not what I want to hear. What I want from you brother is the truth, I want to know what ... happen[ed]." After being reassured once again that Detective Hazel would tell the District Attorney's office that he needed help, petitioner agreed to tell the truth. At first he gave a rambling account of his past violent behavior, recalling an incident in which his brother's former girlfriend provoked his brother into hitting him and knocking him out. He blacked out on other occasions: once he killed a kitten without realizing what he was doing and he often fought with his girlfriend, Sharon, "for no reasons."

Green turned to the day of the murders, claiming still that he did not remember most of what happened at Shirley Williams' apartment that day. He recalled that Shirley let him into the house, and the two of them talked about religion. She received a telephone call from her sister, but the call got disconnected after a few seconds. When her sister called back, Shirley told her that he was in the apartment. (Telephone Company records verified the two telephone calls.) While Green was there, Shirley served breakfast and Latisha played with her hula hoop. The last thing he remembered was Shirley's bending over in Latisha's room to put something in a dresser drawer. Then he blacked out.

When he regained consciousness, he was in the living room. He saw blood everywhere. He went into the bathroom and found the bodies of Shirley and Latisha in the bathtub and tried to wake Shirley. When he realized that she was dead and that he had killed her, he wanted to kill himself. He searched the apartment for the weapon he had used, finding only a few knives near the kitchen sink, exactly as he had seen them earlier. During this portion of his narrative petitioner began to cry. Unable to find the murder weapon, petitioner took the subway home. Once back in his own apartment, he said he painted his sneakers in order to conceal any blood that might be on them and destroyed his green jacket by burning it on the roof and throwing the ashes down the incinerator.

Green explained to Detective Hazel that he did not intend to kill Shirley and Latisha and reiterated his concern that his confession would upset members of his own and Shirley Williams' families. Then he added,

> You know I am going to tell you something brother, to be honest with you, what made me sit down here and tell you what I told you was not for you to help me that was on my mind, I said to myself I am sitting up here thinking, I said to myself, what if they don't have enough evidence on me, what if they really don't have enough and I get off this shit. Where is it gonna lead to. I am going to go out there and do it to somebody else, I am going to hurt somebody else man. I

am going to ... it might be my mother. I might be at my mother's house. I might just go off one day, I was always, I was always afraid that and I might do something to my family one day and not being aware of it. Man I thought about this when you was talking to me you were saying helping me, helping me, helping me, then I said to myself, what if I just say I don't want your help and let them go out and take everything they got and try to hit me with it, and don't do nothing and I get out, who else has got to suffer for my stupidity....

During the interview, Green was allowed to use the bathroom. Afterwards, Detective Hazel put him into a holding cell and gave him a sandwich, a soda, and cigarettes and asked if he wanted to make any telephone calls. Green declined. The tape recorder was turned off at about 6:20 p.m. The interview had lasted about two hours altogether, more than half of which was recorded.

The detectives notified the Kings County District Attorney's office that Green wanted to make a statement. Assistant District Attorney (A.D.A.) Paul Callan arrived at the 68th precinct at 8:30 p.m. that evening. After conferring with the two detectives and listening to the tape of the interrogation, he interviewed petitioner at about 10:30 p.m. He testified that Green's physical condition appeared normal, and that Green was coherent and responsive and did not complain of any mistreatment. He advised Green of his *Miranda* rights, and gave him the option of being questioned outside the detectives' presence. Green said that he would prefer to have both detectives present. He then repeated the account of events he had given earlier. (This interview of Green was transcribed by a stenographer and admitted into evidence at the suppression hearing and read in its entirety into the record at trial.) Obtaining the statement took about one half hour. Although Green became emotional at times, he did not cry. Detective Hazel told Callan that Green needed psychiatric treatment.

Callan then authorized petitioner's arrest and drew up an application for a warrant to search Green's apartment. A warrant was obtained after midnight and immediately executed by the two detectives. They found two pairs of painted sneakers in Green's closet and a green jacket lying on the bed in his bedroom. Meanwhile, Officer Zawicki transported petitioner from the 68th precinct to Brooklyn Central Booking to complete the arrest process.

## STATE COURT SUPPRESSION HEARING

At the state court suppression hearing, Dr. Franklin Klaf, a forensic psychiatrist, testified as a defense witness. He stated that he had examined Green twice for the purpose of determining his fitness to proceed and his sanity at the time of the crime. During these interviews, petitioner told Dr. Klaf that he was aware of the charges against him, that he had been in the victim's apartment, and that he knew that the victim had told her sister over the telephone that he was there. Dr. Klaf found him to be of above average intelligence with a very good "fund of general information" and to be very "streetwise."

Green gave this witness a version of what happened on March 25, 1978 different than the one given the police. He said that he went to the Williams' apartment at 9:30 in the morning and ate breakfast with Shirley and her daughter while they talked about religion. He used the bathroom and the telephone rang twice. Then, Green said, the doorbell rang and Shirley admitted a 27-year-old man with a goatee. The man was impatient and gave Green money to go out and buy marijuana. When Green returned 40 minutes later he found the victims' bodies in the bathtub.

Green told Dr. Klaf that he had been questioned by two detectives who wanted him to confess to the killings, but that he had asserted his innocence. He said that the detectives had not wanted to hear about the other man and had suggested to him instead that he had seen Shirley Williams bending over and that then he had blacked out and later awakened to discover

the bloody bodies. Even though he did not think the "streetwise" and intelligent petitioner was an easily suggestible person, Dr. Klaf nevertheless stated that in his opinion Green's confession to Detective Hazel had been coerced through brainwashing techniques, so that petitioner came to believe his statement to the police whether it was true or not.

The following factors were identified by Dr. Klaf as critical in his evaluation of petitioner's interrogation: petitioner's initial denial of guilt; the suggestiveness of the interrogation (particularly the suggestion that petitioner was mentally unbalanced); the pressures created by the false representations about evidence against him; petitioner's separation from family and friends; the promises of help by interceding with the district attorney and petitioner's family; petitioner's crying and emotional collapse; the statement itself; and petitioner's perceived friendship with his interrogators. Dr. Klaf further opined that petitioner's later statement to A.D.A. Callan was given as a result of the earlier brainwashing. The doctor noted that since the confession to Detective Hazel had resulted from brainwashing, the presence of the two detectives during Green's statement to Callan justified the doctor's conclusion regarding this statement.

Nonetheless, as the suppression judge found, Dr. Klaf mistakenly estimated that Green was questioned by the detectives for 11 hours instead of the two hours that the interrogation actually lasted. The expert further based his opinion on the incorrect assumption that petitioner was painfully handcuffed during the entire interrogation when he was not handcuffed at all during his questioning. Dr. Klaf also mistakenly believed that the interview with A.D.A. Callan commenced within an hour after the initial statement to the detectives, instead of four hours later.

Defense counsel argued that petitioner's statement to Hazel at the 68th precinct should be suppressed as involuntary. He contended that the promises of assistance made to petitioner by Detective Hazel made the confession involuntary under

*Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), and involuntary under the totality of the circumstances because of the false assertions that the police had strong evidence of petitioner's guilt and Dr. Klaf's testimony that petitioner was brainwashed and his statement psychologically coerced. Defense counsel also argued that petitioner's statement, "if you finish with me, you can take me to the cell," voiced a desire to stop the interrogation. Because Detective Hazel improperly ignored the request, the subsequent statement had to be suppressed. In addition, defense counsel contended that petitioner's statement to A.D.A. Callan and the items seized pursuant to the search warrant had to be suppressed as fruits of the earlier statement made to Detective Hazel. The prosecutor responded that certain details contained in petitioner's statement (the child's hula hoop, the items eaten for breakfast) indicated that petitioner's statement was truthful, and that its truthfulness supported the conclusion that it was voluntary.

Holding that Green's statements were voluntary, the state trial court denied the motion to suppress the evidence. The trial court found that the petitioner had been fully advised of his *Miranda* rights before being questioned at the 68th precinct and that he had consented to talk without an attorney present. The state court justice also found that the detectives had used "chicanery" in overstating the amount of evidence against Green, had made general statements of sympathy and understanding to him, and had promised to talk to the assistant district attorney in order to help him, yet the court concluded that this conduct did not deprive Green of his constitutional rights and that he freely confessed. It found that the contention that Green's story was "suggested" to him by the police was belied by the amount of detail in Green's story. It ruled that his statement to the assistant district attorney was not tainted in any way by what had gone on before and that it was also voluntary. Doctor Klaf's opinion was rejected by the trial court because—as noted above—it was based in important respects on incor-

rect impressions regarding the circumstances of Green's interrogation.

## OTHER PROCEEDINGS

The People's evidence at trial consisted of Green's statement to the detectives and his statement to A.D.A. Callan describing his visit to Shirley Williams' apartment on the day of the murders, corroborated by various items of forensic and other evidence. Detectives Fred Hazel and Thomas Byrnes reiterated the testimony they gave at the suppression hearing, as did A.D.A. Callan. The jury found Green guilty of two counts of murder in the second degree and he was sentenced to two consecutive 25–years to life sentences.

Petitioner's appeals through the New York State Courts were unavailing. *People v. Green*, 102 A.D.2d 873, 477 N.Y.S.2d 304 (2d Dep't.), *appeal denied*, 63 N.Y.2d 776, 481 N.Y.S.2d 1029, 470 N.E.2d 874 (1984). His petition for a writ of habeas corpus was denied by Judge McLaughlin in a published opinion, *Green v. Scully*, 675 F.Supp. 67 (E.D.N.Y.1987). On January 11, 1988 the district court granted petitioner a certificate of probable cause to appeal to this Court explicitly for the purpose of considering the appropriate standard for evaluating the voluntariness of a confession.

## DISCUSSION

We describe first the scope of our power to review this habeas petition. The factual findings of the New York Courts are presumed to be correct. *See* 28 U.S.C. § 2254(d) (1982). The statutory presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them. *See Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980). Whether Green waived his Fifth Amendment privilege against self-incrimination presents a question of law that we review *de novo* in order to make an independent determination of whether his confession is voluntary. *Miller v. Fenton*, 474 U.S. 104, 110–11, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985); *see Davis v. North Carolina*,

384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966).

## I Voluntariness of a Confession

We begin with the Fifth Amendment's guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Having witnessed over the centuries those inquisitions —whose variety and devilish ingenuity were limited only by man's creativity—that compelled a confession from a suspect's own mouth, the framers incorporated into the Bill of Rights this hardwon common law concept against self-incrimination. Consequently, in our accusatory system of criminal justice, the government by its own efforts must unearth the evidence against a suspect and may not procure it from the accused against his will. *See Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). "[T]he very fact of custodial interrogation exacts a heavy toll on individual liberty," *id.* at 455, 86 S.Ct. at 1618, because the circumstances are inherently coercive. Police have no right to question a suspect who is in their hands; it is the suspect that has a constitutional right to remain silent. *Id.* at 460, 86 S.Ct. at 1620.

Thus, it follows that only those statements a suspect makes "in the unfettered exercise of his own will" may be used against him, *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964), and a confession is voluntary only when it is "truly ... the product of his free choice." *Miranda*, 384 U.S. at 458, 86 S.Ct. at 1619. A confession is not self-determined when brought about by circumstances that caused the petitioner's will to be overborne at the time he confessed. *See Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963).

### A. *What Rule Applies*

The initial question that we must resolve is what standard guides us in resolving the ultimate question of voluntariness: " 'Is the confession the product of an essentially free and unconstrained choice by its maker?' " *Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)). Petitioner argues that *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), requires that a confession induced by " 'any direct or implied promises, however slight,' " must be suppressed. *Id.* at 542–43, 18 S.Ct. at 186–87 (quoting 3 *Russell on Crimes* 478 (6th ed. 1896)), and that this Circuit has adopted the rule in *Bram,* pointing to *United States v. Fisher,* 700 F.2d 780, 783 (2d Cir.1983). Petitioner concedes that we employ a "totality of the circumstances" rule, but argues that *Bram* 's continued viability independently mandates suppression of Green's confession because of Detective Hazel's repeated promises to help him.

Petitioner misreads the Supreme Court's and our decisions. There are not two rules—standing as twin lighthouses—to guide a reviewing court safely to harbor in determining whether a confession is voluntary. There is only one guide—the totality of the circumstances rule. No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances. *See Fare v. Michael C.,* 442 U.S. 707, 726, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978); *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1342, 10 L.Ed.2d 513 (1963); *Lynumn,* 372 U.S. at 534–35, 83 S.Ct. at 920–21; *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 348, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963); *Wolfrath v. La Vallee,* 576 F.2d 965, 971 (2d Cir.), *cert. denied,* 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed. 2d 328 (1978); *Tanner v. Vincent,* 541 F.2d 932, 936 (2d Cir.1976), *cert. denied,* 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977).

In *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Supreme Court explained the significance of the "promises" language used in *Bram*

before ruling that Brady's plea was not compelled even though he was promised leniency if he pled guilty without going to trial, where he might have faced the death penalty. Bram, the Court observed, was in custody, alone, and without counsel; under those circumstances even a slight promise of leniency was deemed sufficient to overcome his will. *Id.* at 754, 90 S.Ct. at 1472. In *Fisher* we adopted *Brady* 's reading of *Bram* in examining the circumstances surrounding petitioner's inculpatory statements to a police officer who had assured petitioner that he would not give federal authorities the information. *See Fisher,* 700 F.2d at 783.

A reading of our own decisions reveals that the presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision. *United States v. Guarno,* 819 F.2d 28, 30 (2d Cir.1987); *United States v. Ceballos,* 812 F.2d 42, 51 (2d Cir.1987); *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). Other circuits also conclude that promises do not require an analysis separate from or different than the totality of circumstances rule. *See, e.g., Cole v. Lane,* 830 F.2d 104, 105 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1053, 98 L.Ed.2d 1015 (1988); *United States v. Garot,* 801 F.2d 1241, 1245 (10th Cir.1986); *Miller v. Fenton,* 796 F.2d 598, 608 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 585, 93 L.Ed. 2d 587 (1986); *United States v. Shears,* 762 F.2d 397, 401–03 (4th Cir.1985). Thus, the inquiry in each case is whether such a promise overbears a suspect's will, as the promise of leniency did in *Bram,* either alone or in conjunction with other factors.

**B.  *Circumstances Considered***

In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the condi-

tions of interrogation, and (3) the conduct of law enforcement officials. The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *Guarno,* 819 F.2d at 30. The second circumstance, the conditions under which a suspect is questioned, includes the place where an interrogation is held, *Mincey,* 437 U.S. at 398, 98 S.Ct. at 2416 ("It is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than [interrogation in a hospital's intensive care unit]."); *see also Bram,* 168 U.S. at 563, 18 S.Ct. at 194, and the length of detention, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. The presence or absence of counsel is a significant condition because counsel can "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625.

The final and most critical circumstance for purposes of this appeal is the law enforcement officers' conduct. Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; whether there was physical mistreatment such as beatings, *see Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, *see Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; or even of clothing, *see Bram,* 168 U.S. at 561, 18 S.Ct. at 194 (suspect was taken to police detective's office and there "he was stripped of his clothing") for a prolonged period. In addition—as specifically raised in the instant case—such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

Also gleaned from the case law—as a corollary to a consideration of factors—is that these factors are not to be weighed against one another on a balance scale, with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. *See Brady,* 397 U.S. at 754, 90 S.Ct. at 1472. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act. Y. Kamisar, *Police Interrogation and Confessions,* Chapt. I, *What Is an "Involuntary" Confession?,* 1 (1980) (discussing police interrogation techniques as they bear on voluntariness).

II  Application of Rule in Instant Case

■ We turn finally to analyze the recited factors in light of the evidence in the record. In so doing we have in mind the admonition that each case rests on its own state of facts and that previously decided cases provide little certainty of result because what was adequate in one case to produce an involuntary confession does not establish that the same result has been created in a different, but somewhat similar set of circumstances. *See Bram,* 168 U.S. at 548–49, 18 S.Ct. at 189.

Petitioner was 23 years old at the time he was questioned, his expert Dr. Klaf testified that he was of above average intelligence, streetwise, had a good "fund of general information," and had attended school to the tenth grade. He had some familiarity with the criminal justice system by virtue of having been arrested on two previous occasions and questioned once by the police in Suffolk County, New York. The present interrogation occurred in a hearing room at the homicide office of the 68th precinct. The interview with the detectives lasted for just over two hours during the afternoon of April 17th (from 4:20 to 6:30 p.m.); the statement to A.D.A. Callan lasted from 10:30 to 11:00 p.m. that same evening. Thus, we find nothing revealed in the characteristics of the accused or the conditions of interrogation that suggests an overbearing of Green's will.

The third and most critical circumstance —and the focus of petitioner's challenge— is the conduct of Detectives Hazel and Byrnes. There is no suggestion of physical mistreatment by the detectives. Petitioner was not handcuffed at any time during the interrogation. Following it he was allowed to use the bathroom and was furnished with food, drink, and cigarettes.

Concededly, petitioner was apart from family, friends, and legal counsel throughout this time. This factor is dispelled though by the fact that Green was given his *Miranda* rights by Officer Zawicki at the 71st precinct and later by Detectives Byrnes and Hazel at the 68th precinct immediately preceding the questioning that led to his confession. Both times Green stated that he was willing to answer questions without the presence of an attorney. Even though the version he gave to Dr. Klaf of the events on the day of the murders differed from his recorded statement, there is no claim now that he did not understand his rights to have counsel present or that he preferred not to talk without counsel present.

The principal thrust of petitioner's argument is that his confession should be suppressed because it was wrongfully induced by false promises of help which held out the prospect of more lenient treatment. These promises, coupled with the detectives' misrepresentations that they already had enough evidence for his arrest and Detective Byrnes' reference to the electric chair before the questioning was recorded, petitioner continues, exacerbated the pressure on him. Petitioner asserts all of these facts considered together created coercion that was sufficient to and actually did overbear his free will.

We find the police conduct troubling. Because of it the issue of voluntariness is not free from doubt. We turn first to the promises of help. In *Lynumn*, 372 U.S. at 534, 83 S.Ct. at 920, a female petitioner was encircled in her apartment by three police officers and a twice convicted felon who had turned her in. She was promised leniency and threatened that if she did not "cooperate" her infant children would be taken away from her. *Id.* Counsel for the State of Illinois conceded at oral argument in the Supreme Court that the totality of the circumstances produced a coercive effect upon petitioner; the Supreme Court held her confession not voluntary. *Id.* We do not think the circumstances in the case at bar require the same result. Although Detective Hazel did offer psychiatric help, nothing he said could be construed as holding out the hope of leniency in the courts or a shorter sentence. Even were this offer of help somehow to be interpreted as inducing Green to have such a hope, that belief would be dissipated by Hazel's advice that Green should not think he was going to escape responsibility for what he did and telling Green that he would have "to go to jail."

Turning to the other arguments advanced, a careful reading of the interview demonstrates that the scare tactic improperly used by Detective Byrnes in his reference to the electric chair were not further employed by Detective Hazel to play upon Green's fears for his own life. Hazel told petitioner several times that this case was "not about the chair." The "chicanery"— as the state trial judge termed the practice —of Detective Byrnes' asserting that he already had a strong case against petitioner and telling Green that his fingerprints matched the prints in blood in the victims' apartment is the type of police tactic that makes the issue of voluntariness in this case such a close one. But the motivation for Green's confession we are persuaded resulted not from this or any other police conduct: instead, he confessed for an entirely different reason, as revealed in a significant statement petitioner made to Detective Hazel.

Petitioner explained to Detective Hazel towards the end of the interrogation, after he confessed to murdering Shirley and Latisha, that "to be honest with you, what made me sit down and tell you what I told you was not for you to help me." Green expressed concern that without his confession, the police might not have enough evidence (allaying to some extent the "chicanery" because it apparently was not the crucial motivating factor) and he would "get off." Then, he added, "I am going to go out there and do it to somebody else.... [I]t might be my mother." This statement

convinces us that the scare tactics, false representation as to the evidence, good cop/bad cop routine, and whatever hopes were instilled from the promises or fears from the reference to "the chair" considered together did not overbear Green's will and bring about his confession. He confessed—as he candidly admitted—because he was afraid that what he had done to the victims in a blackout would be something he was going to do to his own family —maybe even his mother.

## CONCLUSION

We conclude as a result of our independent evaluation of this record that the statement petitioner made was his free and unfettered choice, and that it was not coerced by the conduct and tactics of law enforcement officials. As a consequence, the district court's order denying the petitioner's application for a writ of habeas corpus is affirmed.

Order affirmed.