UNITED STATES of America,

v.

Ramzi Ahmed YOUSEF, a/k/a "Azan Muhammad," a/k/a "Khurram Khan," a/k/a "Rashed," a/k/a "Kamal Ibraham," a/k/a "Abdul Basit," a/k/a "Adam Ali Qasim," a/k/a "Naji Haddad," a/k/a "Dr. Paul Vijay," a/k/a "Dr. Adel Sabah," a/k/a "Amaldo Forlani," a/k/a "Muhammed Ali Baloch," Abdul Hakim Murad, a/k/a "Saeed Ahmed," Wali Khan Amin Shah, a/k/a "Grabi Ibrahim Hahsen," a/k/a "Osama Turkestani," Defendants.

No. S12 93 Cr. 180 (KTD).

United States District Court, S.D. New York.

May 29, 1996.

Roy R. Kulcsar, New York City, for Defendant Ramzi Ahmed Yousef; Gail E. Laser, of counsel.

Clover M. Barrett, Brooklyn, NY, for Defendant Abdul Hakim Murad; Bernard Udell, of counsel.

David S. Greenfield, New York City, for Defendant Wali Khan Amin Shah; Bennett Epstein, of counsel.

Mary Jo White, United States Attorney, Southern District of New York City, for U.S.; J. Gilmore Childers, Dietrich L. Snell, Michael J. Garcia, Assistant United States Attorneys, of counsel.

KEVIN THOMAS DUFFY, District Judge:

Defendants, Ramzi Ahmed Yousef, ("Yousef"), Abdul Hakim Murad ("Murad"), and Wali Khan Amin Shah, ("Shah"), are charged with conspiring and attempting to destroy aircraft in foreign air commerce within the special aircraft jurisdiction of the United States, in violation of 18 U.S.C. §§ 32(a)(1), (2), (7), and 371 (Counts Twelve, Thirteen, and Fourteen); conspiring to kill a national of the United States with malice aforethought, in violation of 18 U.S.C. § 2332(b) and (d) (Count Fifteen); conspiring to use a weapon of mass destruction in relation to the conspiracy charged in Count Fifteen of the indictment in violation of 18 U.S.C. § 2332a (Count Sixteen); and using and carrying an improvised explosive device in relation to the conspiracy charged in Counts Twelve and Fifteen, in violation of 18 U.S.C. § 924(c) and 2 (Counts Seventeen and Eighteen). Defendant Yousef is charged with placing and causing the detonation of a bomb aboard a Philippines airliner, in violation of 18 U.S.C. § 32(b) (Count Nineteen), and Defendant Shah is charged with attempting to escape from the custody of the United States in violation of 18 U.S.C. § 751(a) (Count Twenty).

All three Defendants initially were in the custody of foreign law enforcement officials before being rendered to United States' custody. Once in United States law enforcement custody, and while they were being transported via airplane to the United States, all three Defendants made lengthy statements to the law enforcement agents on board the plane. All Defendants have made pre-trial motions to suppress these statements, arguing that the *Miranda* warnings administered by the United States agents were defective and that they did not knowingly and voluntarily waive their Fifth and Sixth Amendment rights to have counsel present during questioning or their Fifth Amendment privileges against self-incrimination. A suppression hearing was held during the weeks of May 6, May 22, and May 28, 1996. All three suppression motions are now denied. The following constitutes my findings of fact and conclusions of law.

## STATEMENT OF FACTS

*The Defendant Yousef*

The circumstances of each Defendant's surrender and subsequent interview by United States law enforcement authorities are unique to each Defendant, and therefore must be considered separately. Yousef was arrested on February 7, 1995 by Pakistani authorities after they had received information regarding his whereabouts in Islamabad, Pakistan from United States officials. (Horton Aff. ¶ 7). United States law enforcement agents were present at the location of You-

sef's arrest, and indeed entered the building minutes after the Pakistani authorities, but they did not play active roles in his apprehension. (Garrett Tr. at 94–95; 136–137). Yousef was then transported by Pakistani authorities to another location in Islamabad. United States Legal Attache Ralph Horton and FBI Special Agent Bradley J. Garrett conducted an interview of Yousef about the location of any explosive devices that may be present in Yousef's rented room in Islamabad. (Garrett Tr. at 96). This five minute interview was conducted prior to administering any *Miranda* warnings because of what the agents perceived as exigent circumstances regarding the possibility of additional explosives in the Islamabad area. (Garrett Tr. at 96; Horton Aff. ¶ 9). Yousef told the agents that explosive devices could be found in his rented room in Islamabad and also that he knew that explosives were found in Manila. (Horton Aff. ¶ 9; Garrett Aff. ¶ 6). Agent Garrett then fingerprinted Yousef and Yousef identified himself by name. (Garrett Tr. at 97). The government has stated that it does not intend to use any portion of Yousef's statements to Agent Garrett as evidence in its case in chief against the defendant. (Govt.Br. 2/21/96 at 22).

Agent Garrett then left the room for approximately one hour and eighteen minutes, during which time he spoke to other United States officials regarding the location of the explosives and the identification of Yousef. (Garrett Tr. at 96–97; 145; 155; Horton Aff. ¶ 9). Agent Garrett returned to the room, identified himself as an FBI agent, and administered *Miranda* warnings in English to Yousef. (Garrett Tr. at 134). Yousef acknowledged that he understood his rights and Yousef signed a handwritten waiver-of-rights form. (Garrett Tr. at 97–98; Horton Aff. ¶ 9). The handwritten waiver-of-rights form did not include the warning that anything the defendant said could be used against him in court in the United States. (GX G1). Agent Garrett does not know whether he orally administered that warning to Yousef. (Garrett Tr. at 98–99). During the course of this administration of the *Miranda* warnings and during all interviewing,

Yousef spoke in English and acknowledged that he understood what was being said to him. (Garrett Tr. at 96). (I note that during all of the in court proceedings including the hearing, all three defendants and their counsel repeatedly had conversations without the aid of an interpreter and Defendant Yousef specifically understood questions posed to him by the court). (*See, e.g.*, Hearing Tr. at 216).

After Yousef signed the waiver form and Agent Garrett determined that Yousef understood the waiver, Yousef acknowledged that he was willing to answer questions. (Garrett Tr. at 99; Horton Aff. ¶ 9). Various other United States law enforcement agents and two Pakistani military agents were present at the site of this interview, but other than Agent Garrett, only an Assistant Regional Security Officer asked Yousef any questions. (Garrett Tr. at 132). During the interview, Yousef never mentioned that he had been in Pakistani custody before that date or that he was tortured by the Pakistanis.[1] (Garrett Tr. 99–100; 168). The entire interview lasted approximately two hours, after which Yousef was again taken into custody by the Pakistani officials. (Garrett Tr. at 100).

Yousef was surrendered by Pakistani authorities to United States custody on February 8, 1995, pursuant to an extradition request by the United States. This transfer of custody occurred less than twenty-four hours after Yousef was originally arrested by Pakistani law enforcement agents. (Garrett Tr. at 94; 101) (the Pakistani officials entered Yousef's apartment at or about 10:00 a.m. on February 7, 1995 and Yousef was surrendered to United States custody at or about 7:00 a.m. February 8, 1995). Yousef was brought aboard a United States government plane by Agent Garrett, examined by a physician, photographed, and provided with clothing. (Stern Tr. at 159). A medical report was prepared wherein Yousef disclaimed any recent injuries or acute medical problems. (Stern Tr. at 161). Yousef was then transported by air to the Southern District of

---

1. Yousef has filed an affidavit in support of this motion, but has not alleged in that affidavit that he ever told any United States officials about the alleged torture.

New York, arriving on February 8, 1995, New York time.

After Yousef had been examined by the physician, both FBI Special Agent Charles B. Stern and Secret Service Agent Brian Parr identified themselves to Yousef and advised him that he was under arrest for the World Trade Center bombing. (Stern Tr. at 161). Yousef was then read his *Miranda* warnings and read them himself in English before he signed a rights waiver form. (Stern Tr. at 161). Agent Stern paused after reading each paragraph of the *Miranda* warnings to give Yousef an opportunity to acknowledge that he understood. (Stern Tr. at 163). Again, the agent issuing the *Miranda* warnings did not perceive any language barrier and Yousef acknowledged that he understood everything that was said to him and everything he read. (Stern Tr. at 162). The warnings did not contain any statement with regard to anything Yousef may have said to the Pakistani authorities. (Stern Tr. at 190). Yousef signed a waiver of rights form and proceeded to answer questions posed to him by the agents. (Stern Tr. at 164; GX S2). In his brief in support of his suppression motion, but not in his own affidavit, Yousef disputes the fact that he signed this second waiver form. (2/1/96 Br. at 24). Yousef proceeded to answer questions, but refused to allow the agents to take contemporaneous notes. (Stern Tr. at 164–65). The entire interview lasted approximately six hours and included four breaks during which Agent Stern wrote notes about the interview. Eventually a twenty-one page FBI Report Form 302 was prepared from Sterns notes. (Stern Tr. at 167). Agent Stern did not use any information that Agent Garrett had obtained from Yousef's prior statements. (Stern Tr. at 164–64; 176). There is no evidence of any physical threat or other coercion on the part of the United States officials who administered the warnings, received the waiver of rights, and interviewed Yousef. At no point did Yousef request an attorney, or request to stop speaking to the agents. (Stern Tr. at 167).

*Defendant Murad*

Murad claims that he was in the custody of the Philippines authorities beginning December 26, 1994 until he was surrendered to the United States law enforcement authorities on April 12, 1995. During that time, Murad claims that he was physically and psychologically tortured by his Philippine captors, beaten, raped, had cigarettes extinguished on his hands and feet, and subjected to a procedure that simulated drowning.

The FBI was aware that Murad was in the custody of the Philippines government starting some time during the week of January 15, 1995. (Pellegrino Tr. at 662). However, no indictment was brought against defendant Murad until March, 1995. The United States made an official request to the Philippines government at or about the end of January 1995, to see and interview Murad, but that request was withdrawn when a case against Murad developed in the United States. (Pellegrino Tr. at 667–68). The United States in no way participated in or condoned Murad's incarceration in the Philippines and the alleged torture that occurred there. The United States role in Murad's custody was limited to negotiating the transfer of the custody from the Philippines government to the United States. Agent Pellegrino played an active role in those negotiations, and had regular contact with members of the Philippine National Police ("PNP") and the Philippine government. (Pellegrino Tr. at 663; 672).

The Philippines government surrendered Defendant Murad to United States custody on or about April 12, 1995 in Manila, Philippines. (Pellegrino Tr. at 674; Donlon Tr. at 17). Murad was then transported by air to the Southern District of New York, arriving on April 13, 1995. At the time Murad boarded the plane, members of the FBI Hostage Rescue Team, who were immediately responsible for Murad's custody, removed his blindfold, changed his clothes, and handcuffed him. (Pellegrino Tr. at 677). While this was being done, FBI Special Agent Frank Pellegrino informed Murad of the charges brought against him in the United States and read him *Miranda* warnings in English for the first time. (Pellegrino Tr. at 678; Donlon Tr. at 31). Agent Pellegrino testified that he stood very close to Murad at this time to insure that Murad heard what was being said. (Pellegrino Tr. at 679). Murad

confirmed that Pellegrino stood close to him at this time. (Murad Tr. at 373).

Murad testified that he did not hear Pellegrino reading the *Miranda* rights, in part, due to the noise caused by the running engines and that he, Murad, was talking to himself at this time. (Murad Tr. At 378). Agent Pellegrino testified, however, that Murad was not talking to himself during this time, that Pellegrino did not recall the noise of plane engines being loud enough to make conversation difficult, and that Murad acknowledged that he understood everything Agent Pellegrino told him. (Pellegrino Tr. at 678–79).

After Murad's clothes were changed, he was examined by a physician, and a medical report was compiled. (Pellegrino Tr. at 682; Donlon Tr. at 20). The report indicates that Murad "denie[d] any current health problems or injuries." (GX D3).

Murad was then brought to the middle of the plane. (Donlon Tr. at 32). Agent Pellegrino and FBI Special Agent Thomas Donlon introduced themselves as FBI agents, told Murad the reason he was in United States custody, and told Murad that they were going to interview him. (Pellegrino Tr. at 683; Donlon Tr. at 20). Both agents and the Arabic interpreter testified that Murad had no difficulty understanding English and that Murad advised them he did not need the assistance of the Arabic interpreter. (Pellegrino Tr. at 683–84; Donlon Tr. at 21; Eid Tr. at 72). Murad also testified that he can read and understand English. (Murad Tr. at 487).

Agent Pellegrino then read the advice of rights form to Murad in English once again, and the Arabic translator read the Arabic form to Murad. (Pellegrino Tr. at 683; Donlon Tr. at 22; Eid Tr. at 71). While he was testifying during the suppression hearing, Murad had no difficulty reading the original advice of rights form in English. (Murad Tr. at 485). It was only when he was interrupted and asked if he was having any difficulty reading the form that Murad claimed that the form was unclear and that he had told

Agent Pellegrino that aboard the plane. (Murad Tr. at 486). When Agent Pellegrino administered the warnings to Murad, Agent Pellegrino paused after reading each paragraph to give Murad an opportunity to acknowledge that he understood each of the rights. (Donlon Tr. at 22).

Murad was then shown written advice of rights form in both English and Arabic. (Pellegrino Tr. at 683; Eid Tr. at 71; GX D1, D2). Before the Arabic version of the form was given to Murad, the Arabic interpreter hand wrote on the form the warning that anything the accused said could be used against him in court.[2] (Pellegrino Tr. at 699–700; Eid Tr. at 69). Both versions of the advice of rights form included statements to the effect that Murad was in the custody of the United States, that he was no longer in the custody of the PNP, and that nothing said to Murad by the PNP was binding on the United States and that he should not rely on any promises or representations made to him by any Philippine authority. (Donlon Tr. at 25; GX D1, D2). This warning with regard to the Philippine authorities was also included in the waiver of rights section on the form. (Donlon Tr. at 26). This insertion was made into the standard advice of rights of form to alert Murad to the fact that once he was within the custody of the United States, these rights were in place regardless of what the Philippine authorities had told him. (Pellegrino Tr. at 690; Donlon Tr. at 43).

Murad then acknowledged that he understood his rights and stated that he wanted to cooperate with the United States government. (Donlon Tr. at 23, 25–26; Eid Tr. at 71). After Murad was assured that he was in United States custody and that being on board the plane was as if he was in the United States, he signed the waiver of rights form and agreed to give a statement aboard the plane. (Pellegrino Tr. at 687–88; Donlon Tr. at 21, 23–24; Eid Tr. at 71–72; GX D1, D2). Murad never asserted to the FBI agents aboard the plane that he had been tortured in the Philippines. (Ct.'s Ex. 2001

2. The Arabic interpreter testified that this warning had been omitted from the Arabic version of the form and he added it before Murad saw it to

make the form correspond to the English version.

at 13). Murad was told that he was not returning to the Philippines. (Pellegrino Tr. 692). There never was a Philippine representative aboard the plane, although Murad now contends that he believed there was one. (Pellegrino Tr. at 699; Donlon Tr. at 28).

The interview lasted approximately five hours, including numerous breaks. (Donlon Tr. at 26). At no point during the interview on the plane did Murad request to stop the interview or request a lawyer. (Pellegrino Tr. at 700–01; Donlon Tr. at 27). Agent Pellegrino took notes of the interview from which an eighteen page FBI Report Form 302 was prepared. Murad did request to stop talking to the agents once they had returned to the New York FBI Office. (Pellegrino Tr. at 700; Donlon Tr. at 27). At that time, the agents did not ask any more questions of Murad. (Id.)

There is some dispute as to whether Murad in fact read the Arabic advice of rights form once or twice, since Agent Pellegrino's log contains an entry that states that "the suspect re-read his rights." This would only be of import if Murad was shown an incomplete *Miranda* rights form. Three witnesses testified that the Arabic form which was handed to Murad was edited and complete before Murad ever saw it.

Agent Pellegrino testified that in January and February of 1995 he was aware of Murad's incarceration in the Philippines, and that at the end of March he became aware of the fact that he was being interrogated. (Pellegrino Tr. at 664; 669). Agent Pellegrino in fact received copies of transcripts of certain of the interrogation sessions. (Pellegrino Tr. at 670). Agent Pellegrino never knew the identity of any of Murad's interrogators. (Pellegrino Tr. at 664). However, Agent Pellegrino never received a transcript of the tape of January 7, 1995, the only tape which contains any evidence of the possibility of mistreatment of Murad by the Filipinos. (Pellegrino Tr. at 671). None of the transcripts which Agent Pellegrino reviewed contained any indication that Murad was being beaten or tortured by anyone in the Philippines. (Pellegrino Tr. at 672). After an in camera review of those transcripts which Agent Pellegrino had access to, I conclude

that nothing in those transcripts remotely indicates the presence of any torture.

I also conclude that the testimony given by Defendant Murad regarding his torture and forced cooperation with the Philippine authorities is not credible. I observed the defendant testify for two days and heard many inconsistencies in his testimony which lead to the conclusion that this testimony is not credible.

Murad testified that during the alleged "drowning" procedure, he was handcuffed behind his back, forced to lie down on his back, and then one interrogator would sit on his knees and two others would hold back his two hands. (Murad Tr. at 333). Of course, this is physically impossible.

Murad testified that the torture began on the day he was abducted, December 26, 1994, and that the worst part of his torture occurred during the first three days of his captivity. (Murad Tr. at 407–08). However, the only objective evidence that remotely supports Murad's allegations of torture is a taped interrogation session dated January 7, 1995, the day the Philippines authorities state that Murad was arrested. The actual statements contained on that tape are somewhat unclear, and the only transcript of this taped session available is one that was prepared by the defense for the purposes of this motion. (Murad Ex. A; Tr. at 346).

Although Murad claims that he was subject to torture the entire time he was in custody of the Philippines authorities, he also testified that his captors began treating his alleged wounds about five days after he was abducted. (Murad Tr. at 411).

Murad testified that the torture included extinguishing cigarettes on both his hands and his feet, yet he was unable to show any burn scars to the court when requested to do so. (Murad Tr. at 443). According to Murad, his captors began treating him well during the last month of captivity so that they could turn him over to the FBI; he alleges that they used a balm on his hands, which removed the burn scars.

Murad also testified that he went to the Philippines on December 26, 1994 to bring money to Defendant Yousef. (Murad Tr. at

396). Murad testified that Yousef called him at his uncle's home in Dubai and told Murad that he had an accident and was in the hospital and needed Murad to bring him money in the Philippines. (Murad Tr. at 396). However, this explanation of Murad's presence in the Philippines was not included in Murad's affidavit in support of this motion, and conflicts with Yousef's affidavit, which claims that Yousef was in the custody of Pakistani authorities beginning some time in late November 1994. (Yousef Aff. ¶ 4). Although Yousef claims that his Pakistani captors forced him to make various phone calls, he does not state that any calls were made to Murad or describe the contents of those calls. (Yousef Aff. ¶¶ 19–20).

Murad's account of his arrival and detention in the Philippines similarly is not credible. Murad testified that he arrived in Manila on December 26, 1994, and, following Yousef's instructions, he met a man named Yunis at the airport. (Murad Tr. at 398). According to Murad, Yunis and two other men took him in a car and drove for two and a half hours outside of Manila to a villa where he was eventually abandoned by Yunis and abducted by Philippine captors. (Murad Tr. at 399–402). Murad testified that he never saw Yousef in the Philippines and that he never checked into the Las Palmas Hotel. (Murad Tr. at 409–10; 417–18). Contrary to this testimony Murad attested in his affidavit that he was arrested in Manila. (Murad Aff. ¶ 3). When questioned about this inconsistency at the hearing, Murad tried to distinguish the term "arrest" from "abduction" or "apprehension." However, other than this original alleged abduction, Murad does not mention any other time when he was transferred from his original captors' custody to that of other Filippino authorities. Since he asserted that he was blindfolded for the majority of his time of captivity, Murad could not have known whether he was transported to Manila at some point for a more formal arrest procedure. (Murad Aff. ¶ 6).

Moreover, the government produced a registration card from the Las Palmas Hotel that shows that a "Saeed Ahmed" checked into the hotel on December 26, 1994. (M1, p. 5). Murad testified that it is his handwriting and his signature on this card. (Murad Tr. at 414–15). Murad appears to include this card as one of the items which he was forced to write out by the Philippine authorities during his captivity. (Murad Tr. at 444). However, also part of the same exhibit is a "Las Palmas Daily Arrival Report", which lists the names of all those who checked into the hotel on December 26, 1994. (M1, p. 3). Such a log is kept in the course of the hotel's regularly conducted business activity. The twelfth of twenty-five entries on that log shows that a Saeed Ahmed arrived at the Las Palmas Hotel on that date. Since such a complete log is inherently credible, it refutes Murad's testimony that he never checked into the hotel, and that he was abducted by Philippine captors outside of Manila on that date.

Murad also testified that his captors forced him to rehearse responses to certain questions; however, his testimony as to when, how long and with whom this practicing occurred is inconsistent. He testified that the practicing started before the January 7, 1995 tape was made. (Murad Tr. at 463–64). Certain portions of that tape were played during the hearing, which Murad claims reflect his condition immediately following an episode of the drowning procedure which he allegedly suffered. When questioned why he would resist telling his captors the practiced material, and thereby insuring that he would be tortured again, Murad testified that a different interrogator was present at that time so he thought he could deny their allegations. (Murad Tr. at 466–67). Murad apparently was able to distinguish this interrogator from the others even though he, Murad, was blindfolded and could not know who was in the room with him. (Murad Tr. at 467).

Murad's testimony that the rehearsal of answers began prior to January 7, 1995 conflicts with his other testimony to the effect that the practicing did not begin until the last month of his captivity when it became clear to Murad that the Filipinos were preparing him for something. (Murad Tr. at 493).

Murad's claims as to what he was forced to write are also inconsistent. When presented

with a number of documents in his handwriting, Murad at first stated that they were his papers which he wrote in the United Arab Emirates, and then once he saw that one of the sheets had a reference to the Las Palmas Hotel in the Philippines, he stated that it could have been a page that his captors forced him to write in the Philippines. (Murad Tr. at 451–52) (M4–A, B, C).

Of all the statements that Murad was allegedly forced to say, he apparently was not forced to say that his plan in America was "killing the people there, teach them." (Murad Tr. at 465).

Murad also introduced a Psychiatric Legal Report written by Angela M. Hegarty. (Ct's Ex. 2001). Dr. Hegarty also testified at the suppression hearing. Dr. Hegarty diagnosed Murad as suffering from "Brief Psychotic Disorder with Marked Stressors" and "Post Traumatic Stress Disorder" (PTSD). (Ct's Ex. 2001 at 31). According to Dr. Hegarty, Murad was suffering from these disorders at the time he was questioned aboard the plane. (Ct.'s Ex. 2001 at 31). Based on her observations of Murad, Dr. Hegarty concluded that Murad "lacked the capacity to voluntarily and knowingly waive his rights." (Ct.'s Ex. 2001 at 33).

As with many other psychological disorders, there is a great possibility that a patient suffering from these disorders may in fact be malingering. Although Murad admitted to Dr. Hegarty that he sometimes lies (Ct.'s Ex. 2001 at 20), and that he in fact lied to Dr. Fredrick, who had conducted a prior evaluation of Murad, (Id. at 27), Dr. Hegarty stated that if she knew that Murad had lied about his arrest in the Philippines, she would have just considered that another lie that would not change the conclusions of her report. (Hegarty Tr. at 534). I believe that Dr. Hegarty was bamboozled by Murad and I therefore must give little weight to her testimony and her conclusions.

*Defendant Shah*

Shah was arrested by Malaysian officials sometime in the afternoon of December 11, 1995 and surrendered by Malaysian authorities to United States custody sometime in the early morning hours of December 12, 1995. (Pellegrino Tr. at 631; Besheer Tr. at 208–09). When he was turned over to the United States law enforcement authorities, Shah's head and arms were wrapped in surgical gauze. (Besheer Tr. at 210). However, once aboard the United States plane, the gauze was removed, and no medical injuries were readily apparent. (Besheer Tr. at 210). Shah was then given a change of clothes, fingerprinted, positively identified, and examined by a physician (Besheer Tr. at 211). The physician Dr. James Nold asked Shah for a complete medical history and he conducted a physical of Shah. Dr. Nold concluded that Shah was stable enough to travel. (Nold Tr. at 603–04; Def. Shah Ex. A). Although Shah complained of injuries sustained while he was in the custody of the Malaysians, those injuries consisted of what appeared to be rug burns to his right knee and abrasions to his right wrist sustained as a result of being handcuffed. (Nold Tr. at 598). Shah told Dr. Nold about various medical history problems, but also told Dr. Nold that, at the time, he was in general good health. (Nold Tr. at 609). Dr. Nold testified that during the course of the examination, Shah had little difficulty understanding English, and had no difficulty hearing the questions posed to him. (Nold Tr. at 610).

After the examination, and before the plane took off from Lankawi, Malaysia, Shah was led to a cubicle aboard the plane, where he was met by Special Agent Frank Pellegrino and Detective Matthew Besheer of the Port Authority of New York and New Jersey. (Besheer Tr. at 212; 218). The two agents introduced themselves, told Shah that he was under arrest for the conspiracy to bomb United States airliners and that he was being transported to the United States. (Besheer Tr. at 213). The agents determined that an Arabic interpreter was not necessary for Shah to understand them, and Agent Pellegrino proceeded to read Shah his rights in English. (Pellegrino Tr. at 642; 646–47; Besheer Tr. at 213; 222 GX B1). The agents did not perceive any difficulty on Shah's part in understanding them. (Besheer Tr. at 217). Agent Besheer recalled three occasions during which Shah requested the agents to repeat themselves, which they did. (Besheer Tr. at 222). The rights form

used for Shah contained warnings that nothing said to Shah by any foreign government was binding on the United States government, and that he should not rely on any promises or representations made to him by any other government. (GX B1). The waiver of rights portion of that document also contains the statement "[i]n making this waiver, I am not relying on any promises or representations made to me by any other government, nor is this waiver made in response to any pressure or coercion by the authorities of any other government." (GX B1). The same statements are contained in the Arabic rights form that was given to Shah to read. (Besheer Tr. at 221; 228; GX B2).

Shah now argues that these statements indicate that the United States officials conspired with their Malaysian counterparts to torture and abuse Shah into making a statement. I do not in any way credit this argument. Agent Pellegrino testified that the United States was aware of Shah's presence in Malaysia, and made a request upon the Malaysian government for his arrest and surrender. While the FBI was generally aware of the time and place of Shah's arrest, they did not know anything more with regard to the nature of the arrest and the conditions of Shah's subsequent confinement. (Pellegrino Tr. at 617–19).

Agent Pellegrino then read Shah his rights in English, stopping after each paragraph to give Shah the opportunity to acknowledge that he understood each paragraph. (Pellegrino Tr. at 653). After reading the English version of the rights form to Shah, Agent Pellegrino then gave Shah both the English and Arabic forms to read. (Besheer Tr. at 218). The agents were told by the Arabic interpreter on board that the Arabic rights form contained the same warnings as those contained in the English version. (Besheer Tr. at 221; 228; GX B1, B2). After reading the forms, Shah acknowledged that he understood his rights and was willing to sign the waiver form. (Besheer Tr. at 219; Pellegrino Tr. at 653). Shah asked if he had to answer all the questions posed to him and he was told that he only had to answer those questions he wished to. (Pellegrino Tr. at

654; Besheer Tr. at 219). Agent Pellegrino testified that Shah was told he did not have to sign the forms, but that he could sign the forms if he understood his rights and wanted to speak to the agents. (Pellegrino Tr. at 654). Shah signed the waiver form and proceeded to answer questions posed by Agent Pellegrino. (Pellegrino Tr. at 655). Detective Besheer took contemporaneous notes from which a five page FBI Report Form 302 was prepared. (Pellegrino Tr. at 655–56). At no point during the questioning did Shah verbally refuse to answer a question, however, there were times when he did not respond to a question posed by the agents. (Besheer Tr. at 223). When this occurred, the agents would not persist until they received an answer from Shah, but would just move on to another question. (Besheer Tr. at 223).

At some point during the course of the questioning, and after Shah had given what the agents determined to be untruthful statements, Shah was told by Agent Pellegrino that the defendants in the World Trade Center bombing had received one hundred and forty years in jail. (Besheer Tr. at 224). There was never any physical contact between Shah and the agents who were questioning him. (Besheer Tr. at 224).

At no point did Shah tell the agents that he was mistreated by the Malaysians while in their custody. (Besheer Tr. at 225). Shah was re-administered *Miranda* warnings when the plane crossed into United States airspace, and the interview continued for approximately fifty more minutes. (Besheer Tr. at 227). Shah did not sign the rights form again, but Detective Besheer recorded it in his log. (Id.). Shah did not appear at all confused when he was re-administered his rights, and did not ask any questions at that time. (Id.).

Although Shah was handcuffed during the flight, he was not unduly restrained, was seated in a first class plane seat, and was given numerous opportunities to sleep and eat. (Besheer Tr. at 218; 225). While defense counsel made numerous attempts to portray Shah's extensive periods of sleep during the flight as evidence of his lack of alertness, I construe these periods of rest as

evidence that the agents refrained from asking Shah questions when it appeared to them that he was not fully alert. The fact that they allowed him to sleep does not exhibit coercive tactics on their part in the least.

Shah's lawyer also contends that his eyesight and hearing was so poor that he was unable to understand his rights and make a knowing and voluntary waiver of them. With regard to his eyesight, Dr. Nold testified that he suggested that Shah's contact lenses be removed at some point during the flight, however, he did not know whether they were actually removed. (Nold Tr. at 606). Agent Pellegrino testified that Shah's contact lenses were removed a few hours into the flight, but after Shah had read his rights and signed the waiver form. (Pellegrino Tr. at 638–39; 651).

Shah did not testify but to bolster his claims regarding his hearing loss, a report from an audiologist was admitted into evidence which states that Shah suffers from "very significant bilateral hearing loss." (Def. Shah Ex. E). Shah's lawyer also contends that Shah had a limited vocabulary and use of the English language as shown by a notation in his United States prison medical records which states that Shah responded to a question by a Physician Assistant "in very little English." (Def. Shah Ex. D, p. 3).

## DISCUSSION

█ Logically, in a criminal prosecution, all the evidence compiled, which would assist the fact finder in reaching a conclusion as to the guilt or innocence of a defendant, should be available for the fact finder's consideration. The fact that an accused's post-arrest statement is allegedly the result of coercive conduct on the part of those charged with his custody does not erase the probative value of that statement. While the circumstances under which the statement was given certainly should be scrutinized by a fact finder to determine the amount of weight to give that particular piece of evidence, the circumstances under which statements are obtained are not dispositive of the inherent reliability of that statement. *See Oregon v. Elstad*, 470 U.S. 298, 312, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985) (absent unduly coercive circumstances, "little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the fact finder").

However, our criminal justice system, through the policies enunciated by the Supreme Court, has developed prophylactic measures whereby law enforcement officials are required, except in exigent circumstances, to warn a suspect in custody that he has certain rights, including, *inter alia,* the right to remain silent and the right to have an attorney present during questioning. The accused also is warned that anything he says, if he decides to waive those rights, could be used against him in a criminal prosecution. The accused may knowingly and voluntarily waive his rights and answer questions.

These measures deter law enforcement agents from obtaining custodial statements through unduly coercive means. Thus, statements which are found to have been given without the administration of proper warnings, and without obtaining a voluntary waiver of the rights contained in those warnings, are inadmissible in evidence at any subsequent trial of that defendant. *See Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986) ("The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution") (citations omitted).

█ At a hearing to determine whether a court should suppress such statements, it is the government's burden to establish, by a preponderance of the evidence, that the accused understood the rights which were administered to him and that he knowingly and voluntarily waived those rights. *Connelly,* 479 U.S. 157 at 168, 107 S.Ct. 515 at 522; *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). In analyzing the admissibility of a statement and whether the defendant understood his rights and made a knowing and voluntary waiver of those rights, the court must consider whether, under "the totality of the circumstances", the accused knowingly and voluntarily waived his rights or was coerced into answering questions by means which would violate

the accused's constitutional rights. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1985).

Most foreign countries have a system of law entirely different from that which we enjoy in this country. Indeed, in some countries there is no presumption of innocence; there is no right to remain silent and a putative defendant is not entitled to counsel. This country certainly cannot impose our system of law and constitutional rights on foreign sovereign nations. Nor would we expect such a foreign government to impose its legal system on our proceedings. An extradition proceeding in this country follows our law and conversely we cannot expect our law to govern proceedings in foreign countries.

■ The rationale behind the policies set by the Supreme Court in *Miranda* and like cases just has no relevance to proceedings in a foreign country. The courts of this nation cannot enforce our constitutional guarantees as against foreign government officials acting in their own lands. The fact that the actions of these governmental officials occurred during extradition or expulsion to this country does not make the foreign officials agents of the United States.

In this case, each defendant after being taken into United States custody, signed a waiver of rights after being administered warnings by United States law enforcement agents, and, each defendant indicated they were willing to answer questions.

■ It must first be stated that a technical deficiency in the administration of *Miranda* warnings is not in and of itself a violation of the Fifth Amendment. *Elstad,* 470 U.S. at 306, n. 1, 105 S.Ct. at 1291, n. 1. As is well-established, "the ... *Miranda* warnings are 'not themselves rights protected by the Constitution, but [are] instead measures designed to insure that the [suspect's] right against compulsory self-incrimination [is] protected.'" *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984), quoting *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974). This Circuit has recognized that "[i]t is an unwarranted extension of Miranda to

hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *United States v. Morales,* 788 F.2d 883, 886 (2d Cir.1985), citing *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293; *but see United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991) ("A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given.") The overall inquiry into whether a statement was voluntarily given, therefore, is to consider the totality of the circumstances of the interview to determine if the accused's will was somehow overborne by the agent's coercive conduct.

### Yousef's Suppression Motion

Yousef argues that he was denied his Sixth Amendment right to an attorney during the questioning by the FBI agents, especially given that he was already indicted in the United States for the World Trade Center Bombing and that he had requested an attorney during his extradition proceeding in Pakistan. He also argues that the first *Miranda* warnings given by Agent Garrett in Pakistan were incomplete and defective, and therefore, the statement he gave to Agent Stern was tainted by the original defective *Miranda* warnings and taken in violation of the Fifth Amendment.

■ During the suppression hearing, but not in the papers submitted in support of his motion, Yousef also raised the argument that the *Miranda* warnings he received on board the plane were not sufficient since they did not contain a warning that whatever promises were made by the Pakistanis did not bind the United States. (Stern Cross–Examination at 197–98). The fact that Yousef's warnings did not include a disclaimer with regard to the promises made by a foreign government does not negate the sufficiency of the warning. Indeed, the Supreme Court has noted that requiring law enforcement personnel to adjust the standard Miranda warnings to address all the contingencies of a

particular custodial situation is "neither practical nor constitutionally necessary." *Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1296.

I also reject the suggestion contained in Yousef's papers submitted in support of this motion that he did not sign the second waiver of rights form aboard the plane. (2/1/96 Br. at 7, n. 1). This assertion is not contained in Yousef's affidavit and has been sufficiently rebutted by the testimony of Agent Stern and the affidavit of Agent Garrett, both of whom witnessed Yousef read and sign the form. (Stern Tr. at 164; Garrett Aff. ¶ 10).

■ While it is apparent that the original Miranda warnings administered by Agent Garrett lacked the warning that anything Yousef said could be used against him in court, I find that this deficiency was not so egregious so as to prevent admission of the statement taken by Agent Stern aboard the airplane. Yousef was fully advised of his rights prior to making the challenged statement, and he made a knowing and voluntary waiver of them.

■ The Supreme Court has held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement," and thus, any statement made after the complete *Miranda* warning should be admissible. *Elstad,* 470 U.S. at 314, 105 S.Ct. at 1296. The admission of the subsequent, fully-warned statement depends on whether the original statement was voluntarily given and suffered only from a procedural defect or whether it was taken subject to coercive measures. A procedurally-defective warning can be cured by a complete administration of subsequent *Miranda* warnings. *Id.*

Therefore, if both of Yousef's statements were voluntarily given, the deficiency in the warnings surrounding the first statement will not preclude admission of the second. *See Rollins v. Leonardo,* 733 F.Supp. 763, 766 (S.D.N.Y.1990) (on habeas corpus petition from state court conviction, federal district court held as proper the admission of a sec-

ond voluntary statement given after administration of full *Miranda* warnings).

■ The "totality of the circumstances" test for whether a statement was voluntarily given consists of an inquiry into the characteristics of the accused, the conditions of the interrogation, and the conduct of the law enforcement officials. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Green v. Scully,* 850 F.2d 894, 901 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). The relevant characteristics of the accused are his experience and background, including his education and intelligence. The conditions of the interrogation include the place and length of the interrogation. Facts bearing on the law enforcement agent's conduct include the repeated and prolonged nature of the interrogation, whether there was any physical abuse, the period of restraint, and whether any psychologically coercive tactics were used. *See Rollins,* 733 F.Supp. at 766, citing *Green,* 850 F.2d at 902.

■ With these factors in mind, I find that Defendant Yousef made a knowing and voluntary waiver of his rights after having been fully warned of them by Agent Stern aboard the plane. The fact that the first *Miranda* warnings given by Agent Garrett may have been technically deficient does not taint the subsequent freely-given waiver. The facts show that Yousef is highly-educated and exhibited a complete understanding of the seriousness of the charges pending against him. (Stern Tr. at 162; 166). The physical circumstances of the interrogation were not coercive, as Yousef was seated in a room separated from everyone aboard the plane except Agents Stern and Parr, and a Hostage Rescue Team member, who was responsible for his custody. (Stern Tr. at 161). The entire interrogation lasted six hours, but that included four breaks during which time Yousef was allowed to use the bathroom, eat and drink. (Stern Tr. at 167).

The conduct of the agents similarly did not create a coercive interrogation such that Yousef suffered a complete loss of free will, preventing him from making a voluntary waiver. There is not even a suggestion that any of the agents attempted to trick or oth-

erwise coerce Yousef into giving a statement. Indeed, Yousef appears to have controlled the circumstances of the interview, as the agents complied with his demand that they refrain from taking contemporaneous notes while questioning him. (Stern Tr. at 164–65). No argument was even made that Agent Garrett's initial omission of the warning that anything Yousef said could be used against him was anything more than an inadvertent omission. (Garrett Tr. at 142–43; 154). Moreover, Agent Stern did not use any of the information elicited by Agent Garrett in his prior questioning of Yousef. (Stern Tr. at 164–64; 176).

There is no record of any physical or psychological threat made by any of the agents to induce Yousef's cooperation. Although Yousef was handcuffed and in leg chains during the entire period of his interrogation, his movement was not unduly restricted. (Stern Tr. at 192). The fact that Yousef was handcuffed does not by itself render the custody coercive. The questioning does not appear to have been unduly prolonged either, as the most extensive single period of questioning lasted only three hours, and break periods of up to six hours were provided. (Stern Tr. at 192). I hold that considering the totality of the circumstances involved, Yousef knowingly and voluntarily waived his right to remain silent and his right to have counsel present during questioning.

 Yousef's argument that his post-indictment status somehow heightens his right to have counsel present during questioning regardless of any voluntary waiver is also meritless. While it is fundamental that an accused in custody has a right to have an attorney present during questioning by law enforcement officials, the fact that the accused is indicted does not heighten the right to an attorney. *See Patterson v. Illinois,* 487 U.S. 285, 296, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261 (fact that defendant's Sixth Amendment right to counsel came into existence with his indictment did not preclude police from questioning defendant and did not preclude admission into evidence of uncounseled statements if defendant knowingly and intelligently waived right to counsel).

 Yousef makes the additional argument that he in fact requested an attorney during the Pakistani extradition proceeding and therefore this request should have been extended to the entire period of his interrogation by United States law enforcement agents and should be considered as his invocation of his constitutional right to counsel. The courts in this circuit have long recognized that United States law enforcement agencies cannot be held responsible for the manner in which foreign governments act in extradition or expulsion proceedings of someone in their custody. As stated in *United States v. Lira,* 515 F.2d 68, 71 (2d Cir.1975), United States law enforcement agencies "can hardly be expected to monitor the conduct of representatives of each foreign government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards."

Indeed, as stated above, the purpose of the rule that any statement taken in violation of *Miranda* is inadmissible is to prevent and deter United States law enforcement personnel from taking involuntary statements that are the result of unduly coercive custodial circumstances. This rationale cannot be applied to foreign countries since the law enforcement agencies would not be affected by the application of the exclusionary rule by a United States Court. *See United States v. Welch,* 455 F.2d 211, 212 (2d Cir.1972) (recognizing that the *Miranda* requirements have little if any deterrent effect upon foreign police). Any request that Yousef made of the Pakistani government prior to his surrender to United States officials, therefore, cannot be extended to require the Untied States officials to proceed as if the request was made of them. *See Sahagian v. United States,* 864 F.2d 509, 514 (7th Cir.1988), *cert. denied,* 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989) (United States courts cannot assume the responsibility of supervising the integrity of the judicial system of another sovereign nation, even when a person claims to have been denied constitutional rights in a foreign extradition proceeding).

Once in the custody of the United States, Yousef never requested an attorney or asked to halt the questioning until one was provid-

ed to him. (Stern Tr. at 167). Such a request for an attorney would be the only one that United States law enforcement agents are required to grant in the circumstances presented here.

*Murad's Suppression Motion*

Murad argues that he did not understand the rights which were read to him and did not understand the rights forms which he signed. From the testimony of Agents Donlon and Pellegrino, and the Arabic interpreter, I hold that a careful and thorough *Miranda* warning was given and that Murad was knowledgeable of his rights and made a knowing and voluntary waiver of them. Murad understood English, the rights were complete, and the agents even added the warning that nothing said or promised to him by the Philippine authorities in any way bound the United States. (Snell Aff.Ex.B).

■ At the heart of Murad's motion for suppression is his conclusion that the statement given to United States law enforcement officials was the result of the continued effects of alleged mistreatment suffered while in the custody of Philippines law enforcement officials. Murad argues that the allegedly coercive nature of his custody in the Philippines was somehow imputed onto the United States law enforcement agents, and his waiver of his rights was not voluntarily given. Murad argues that "three months of threats, torture, denial of proper sustenance, and fear at the hands of the Philippine interrogators and the knowledge that he had already confessed, influenced the defendant in such a manner so that he could not have made a conscious and deliberate choice when asked to waive his rights after leaving the Philippines." (Br. at 4–5). Nowhere does Murad complain about his treatment by United States law enforcement agents during the time his *Miranda* rights were given to him and he signed the waiver. (See Dr. Hegarty Report, Ct.s Ex. 2001 at 13: "He acknowledged that neither of the agents threatened him in any way.")

It is clear to me that the Philippine authorities who held Murad in custody were not acting as agents of the United States. Thus, I must consider only whether the circumstances of Murad's interview by the FBI agents aboard the plane were of such a coercive nature that Murad's will was overborne by the conduct of the agents and his waiver was therefore involuntary.

■ The "totality of the circumstances" review is an objective one in which I must consider "the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials." *Anderson*, 929 F.2d at 99, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir.), *cert. denied*, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). No matter what characteristics an accused may display at a particular point in custody, if there is an absence of unduly coercive conduct on the part of the law enforcement officials involved in administering the Miranda warnings and obtaining a waiver of the rights contained therein, I cannot find that the interrogation was so tainted as to require suppression of the custodial statement. As stated by the Court in *Elstad*, the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Elstad*, 470 U.S. at 304, 105 S.Ct. at 1290 (citations omitted).

Even if I were to accept Dr. Hegarty's assessment that Murad suffered from posttraumatic stress disorder at the time the statement was made (which I do not); Murad's psychological state at the time the statement was given, without a showing of official coercion, does not dispose of the question of voluntariness. *See Connelly*, 479 U.S. at 162, 107 S.Ct. at 519 ("... a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional "voluntariness".) There is absolutely no allegation that the FBI agents who questioned Murad in any way threatened, coerced, or tricked him into giving a statement. The circumstances of the questioning were not unduly coercive. I find that Murad understood his rights and made a knowing and voluntary waiver of them.

*Shah's Suppression Motion*

 Shah argues that he did not understand English well enough to waive his rights when he was first in custody of United States officials. To support this he merely points to an entry in the medical log maintained at the Metropolitan Correction Center in this district which states: "Very little ˙English." (Hearing Tr. At 720; Khan Ex. D). While it is quite common for a foreign born person, whose mother tongue is not English to have difficulty in discussing even common medical terms, that does not mean that such a person in any way is unable to carry on every-day conversation or discuss the rights he has under our system of law. The rights given by Agent Pellegrino to Shah are not difficult to understand. Unusual or difficult words were not included. And˙ of prime import, Shah did indicate to Agent Pellegrino when he was having difficulty in understanding. Shah's arguments that he was unable to hear the reading of his rights particularly because of the engine noise and that he was unable to read the paper he signed must be rejected.

I find that Detective Besheer gave a truthful summary of what happened when Shah was surrendered to United States officials. Specifically, his testimony proves:

> . . . after we had informed Mr. Shah as to why we were there and where he was going and for what reason, Special Agent Pellegrino took this form, informed Mr. Shah that he was going to give him his rights, and he proceeded to read each paragraph slowly and deliberately and waited for Mr. Shah to either answer or he would read the paragraph a second time, and he made sure he understood because once he completed reading the paragraph he would ask him if he understood the right.
>
> Q. How did Mr. Shah respond each time he was asked whether he understood what had just been read to him?
>
> A. He understood the rights, he responded with an affirmative answer when he was given his rights.
>
> On a couple of them, and I can't remember which ones they were, which paragraph, he leaned further forward and he like twisted his head slightly and said, "What," and

Agent Pellegrino repeated that particular paragraph for him.

Q. Was this advice of rights process conducted entirely in English or was there any interpreter involved?

A. No, there was no interpreter involved.

Q. Did you have any trouble understanding anything that Mr. Shah was saying during this period of time?

A. No.

Q. Incidentally, where were you located at this time as far as the plane is concerned, where was the plane?

A. The plane was still on the ground.

Q. And you were awaiting take off. Is that right?

A. We needed to refuel the aircraft before starting out, and we could not refuel, the Langkawi runway was not long enough to accommodate the plane with a fully loaded aircraft, we needed to fly back to Kuala Lumpur.

Unbeknownst to us, Kuala Lumpur Airport was having renovations done on the runway and would not open up again until 5:30 local time.

Q. What happened after the process of reading the rights presented on the form was completed?

A. Once Agent Pellegrino finished reading Mr. Shah his rights, he proceeded to take the rights—there was a small table between us. The chairs were, as I said before, they were first class chairs. They were all first class chairs but, nonetheless, if you sat back, you were too far away, so everybody was sitting kind of like on the front of the chair leaning forward resting on the table.

Agent Pellegrino took the form and he placed it on the table and he moved it across the table toward Mr. Shah, who then, he had his hands handcuffed, but he was still able, he picked up the form and he held it and he—I would assume that he read it because he held it and he glanced at it, and Agent Pellegrino told him, you know, if you read the rights also, and he did.

Q. About how long was the defendant looking at the form and appearing to you to be reading?

A. A couple of minutes.

Q. What happened after he finished doing that?

A. We asked him if he wanted to sign it, and he indicated that he would, and we gave him a pen.

Q. Did he have any questions for you before he signed the form?

A. The only question he had, as he was prepared to sign, he already had the pen in his hand, he looked at us and he said did he have to answer all our questions.

Q. What did you say when he asked you that?

A. We told him he did not have to answer all of our questions, he could answer whatever questions he wanted to, whatever questions he wished to answer.

Q. Did he ask anything further?

A. At that point, no.

Q. What did he do after you told him that?

A. He signed the form.

The fact that Shah indicated that he wanted to have certain rights re-read shows that he understood English and that he heard what was being said. The engine noise which supposedly interfered with his hearing was non-existent since the plane was sitting idle either being re-fueled or waiting for Kuala Lumpur Airport to open.

At Shah's first appearance before me, counsel for Shah indicated that his client understood English and did not need an interpreter. (Tr. Dec. 13, 1995 at 2). I could not help notice throughout the proceedings in this court that Shah seems perfectly able to take and read documents given to him at counsel table. His signature on the rights waiver form is where it belongs.

Much is made by counsel that Shah fell asleep at various times on the return trip to this country, including after he had meals. This indicates to me that Shah was not subject to any coercion or torture. To suggest that a person who was arrested at the end of a normal work day and turned over at 2:00 a.m. would not be tired is to ask this court to accept the absurd. It is far from abnormal for a person in such a situation to feel weary. This does not mean anything untoward happened to Shah other than his arrest and surrender to our law enforcement officials.

For the reasons set forth above in connection with similar claims by the other defendants, I reject Shah's claim that since he was allegedly tortured by Malaysian officials, he is entitled to suppression of his statements.

### CONCLUSION

The motions made by the various defendants to suppress their statements are in all respects denied.

SO ORDERED.