Candelario VASQUEZ, Petitioner,

v.

Daniel SENKOWSKI, Superintendent, Clinton Correctional Facility, Respondent.

No. 98 CIV. 3464(DC).

United States District Court, S.D. New York.

June 3, 1999.

Candelario Vasquez, Dannemora, NY, for Petitioner Pro Se.

Robert M. Morgenthau, District Attorney, New York County by Susan Gliner, Assistant District Attorney, New York City, for Respondent.

### MEMORANDUM DECISION

CHIN, District Judge.

Petitioner Candelario Vasquez petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his March 22, 1993 conviction on twelve counts of robbery in the first degree, six counts of rape in the first degree, four counts of burglary in the first degree, two counts of sexual abuse in the first degree,

one count of sodomy in the first degree, and one count of criminal possession of a weapon in the third degree. For the following reasons, I find petitioner's claims to be without merit. Accordingly, the petition is dismissed.

## BACKGROUND

### A. The Facts

Petitioner's convictions arise from his participation in a series of crimes between September 20 and October 12, 1991, during which he and two accomplices, Jose Luis Javier and Jose Ramon Torres, forced their way into the apartments of several families in the Washington Heights section of Manhattan and robbed them at gunpoint. The evidence adduced at trial revealed that, during three of the incidents, petitioner and his accomplices ransacked their victims' apartments looking for jewelry, money, and other property to steal, after which petitioner tied up most of the family members with coat hangers while Javier raped at least one of the women in the household. During a fourth incident, petitioner sent Javier and Torres to the apartment of another family to collect a sum of money he claimed was owed to him or to someone he knew. While petitioner waited downstairs in a car, Javier and Torres forced their way into the apartment and robbed the family at gunpoint, and Javier subsequently raped one of the female members of the household.

Petitioner was apprehended on October 16, 1991 at approximately 1:00 a.m., after a fingerprint discovered at one of the crime scenes, an apartment on Isham Avenue in upper Manhattan, was identified as his. Police detectives thereafter went to petitioner's home, and petitioner voluntarily accompanied them to the 34th Precinct station house, unhandcuffed. Petitioner made numerous incriminating statements at the station house, including a videotaped confession in which he admitted his involvement in the robberies but vigorously denied any involvement in the sexual assaults. In addition, petitioner gave the detectives permission to search his apartment for property stolen during the robberies. Several items of stolen property were recovered from petitioner's apartment as a result of the search.

Petitioner was positively identified by two witnesses in a line-up conducted the day after he accompanied the detectives to the 34th Precinct station house. Based on the fingerprint evidence and the positive identification, petitioner was placed under arrest and charged with numerous counts of burglary, robbery, rape, sodomy, sexual abuse, and criminal possession of a weapon. Petitioner was positively identified by additional witnesses in two separate line-ups conducted several weeks after his arrest.

### B. Prior Proceedings

Prior to trial, petitioner moved to suppress the incriminating statements he made, as well as the victims' identifications of him and the physical evidence seized from his apartment. Justice Rothwax of the New York State Supreme Court, New York County, held a hearing on petitioner's motion on March 11–12, 1993, at which the following facts were adduced.

Upon his arrival at the 34th Precinct station house at approximately 1:30 a.m. on October 16, 1991, petitioner was taken to one of the interview rooms by detectives Erroll Santos and Robert Ledee. Detective Santos began conversing with petitioner in Spanish, informing him that they knew petitioner had been present at the Isham Avenue apartment at which a robbery and several rapes had occurred because a fingerprint that had been lifted from the scene had been identified as petitioner's, and telling him, in substance, that he should tell the officers who he had been with at the apartment; otherwise, petitioner would "take the blame for everything." (H. at 85, 128, 131).[1] According to San-

---

1. Citations to "H. at ___" refer to pages of the transcript from the suppression hearing held

tos's testimony, the detectives then left petitioner alone in the interview room to "[l]et him think for a few minutes." (H. at 130–31; see also H. at 85).

Detective Santos returned to the interview room a few minutes later, at which time he read petitioner his Miranda warnings in Spanish. Petitioner waived his Miranda rights and agreed to talk to Detective Santos. Santos reminded petitioner of the fingerprint that had been found at the Isham Avenue apartment and stressed to petitioner that, unless he revealed the names of the other individuals involved in the incident, petitioner would likely take full blame for the crimes committed. Thereafter, petitioner admitted his participation in that particular incident, but insisted that he had nothing to do with the sexual assaults perpetrated on three female victims. He further informed Detective Santos that Javier had committed the rapes, and then provided the detective with Javier's address. Detective Santos then placed petitioner in a holding cell.

Shortly thereafter, at approximately 2:00 a.m., Detective Santos returned to the station house with Javier in custody and transported Javier and petitioner, unhandcuffed, to the 20th Precinct. Petitioner was placed in another interview room, and approximately an hour-and-a-half later, Detective Santos read petitioner his Miranda rights in Spanish again. Petitioner again waived his rights, and acknowledged his receipt of the warnings by signing the bottom of the Miranda card. Petitioner reiterated that he had accompanied Javier and had participated in the robbery at the Isham Avenue apartment, and again stated that it was Javier who had committed the rapes. Petitioner then also told Detective Santos about his participation in one of the other robberies mentioned above.

The next morning, at approximately 11:40 a.m., after the line-up at which two of the female victims identified petitioner as the perpetrator, petitioner said in Spanish

on March 11–12, 1993.

to Officer Suarez, who was acting as one of the stand-ins in the line up, "I was the one waiting downstairs. I went to use the phone but I didn't call a cab." (H. at 154). This statement was not made in response to any question posed by the officer, but was simply blurted out spontaneously. After the identification, petitioner was formerly placed under arrest.

Several hours later, at approximately 2:00 p.m., Detective Rivera of the 20th Precinct encountered petitioner while going for coffee in the station house. Although Detective Rivera said nothing to petitioner, petitioner asked the detective whether he was "being charged with the rapes." (H. at 157). Petitioner then volunteered that "the two other guys committed the rapes" and that he was "just there." (H. at 157). Some time later that afternoon, between approximately 2:30 and 3:00 p.m., petitioner made another unsolicited statement to yet another detective, Detective Savino. This time, petitioner blurted out that he had told Javier that "they were a family and that he [petitioner] didn't touch the girls. [Petitioner] has a kid also and that [Javier] was the one that touched the girls." (H. at 56).

Late that afternoon, at approximately 5:30 p.m., an assistant district attorney obtained a videotaped statement from petitioner at the 20th Precinct station house. Prior to giving his statement, petitioner was given Miranda warnings for the third time. In this statement, petitioner described in detail the events that occurred at the Isham Avenue apartment. Petitioner also provided a full account of one of the other three incidents in which he had participated. The prosecutor asked petitioner whether he had participated in any other crimes with Javier and/or Ramon. Initially, petitioner denied having participated in any other crimes, but eventually recounted details of the two other crimes as well. At the conclusion of his videotaped statement, petitioner repeatedly insisted that he had not sexually assaulted any of the women.

With the exception of certain physical evidence from his apartment that is not relevant to the instant petition, petitioner's motion to suppress was denied on March 12, 1993. Petitioner's jury trial before Justice Rothwax followed immediately.

On March 22, 1993, the jury convicted petitioner on twelve counts of robbery in the first degree, six counts of rape in the first degree, four counts of burglary in the first degree, two counts of sexual abuse in the first degree, one count of sodomy in the first degree, and one count of criminal possession of a weapon in the third degree. On May 7, 1993, he was sentenced to an indeterminate prison term of from 296 to 598 years.

Petitioner appealed his conviction to the Appellate Division, First Department. The First Department unanimously affirmed petitioner's conviction on January 23, 1997. *See People v. Vasquez*, 235 A.D.2d 322, 652 N.Y.S.2d 962 (1st Dep't 1997). Thereafter, petitioner sought and was granted leave to appeal to the New York Court of Appeals. On October 21, 1997, the Court of Appeals also unanimously affirmed petitioner's conviction. *See People v. Vasquez*, 90 N.Y.2d 972, 665 N.Y.S.2d 952, 688 N.E.2d 1034 (Ct.App. 1997).

This petition followed on May 26, 1998.

### DISCUSSION

Petitioner asserts two grounds in support of his request for *habeas* relief. First, petitioner contends that the trial court erred in denying his motion to suppress his initial statements to police detectives because they (a) were obtained as a result of coercive custodial interrogation and (b) preceded the administration of *Miranda* warnings. Second, petitioner contends that the trial court erred in failing to suppress his subsequent statements to police because these statements were tainted by the detectives' illegal conduct that produced the initial statements.

To obtain relief under 28 U.S.C. § 2254, a petitioner must prove that he is in state custody in violation of the Constitution or laws of the United States. *See* 28 U.S.C. § 2254(a). Accordingly, petitioner must demonstrate that the above errors violated one or more of his constitutional rights.

### A. Claims With Respect to Initial Statements Made at 34th Precinct

#### 1. Claim that the Initial Statements Violated Miranda

As his first claim for *habeas* relief, petitioner contends that his Fifth Amendment rights were violated when the trial court denied his motion to suppress his initial statements to Detectives Santos and Ledee at the 34th Precinct. Petitioner contends that these statements should have been suppressed because, although they were not made until after he was apprised of his *Miranda* warnings, the interrogation that ultimately elicited these statements was conducted prior to his receipt of *Miranda* warnings and therefore the statements were indirectly the product of unwarned questioning by the police. Petitioner's claim is rejected.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that interrogation of suspects under certain custodial circumstances is presumed to be inherently coercive and that, accordingly, any statements made by the suspect under those circumstances are inadmissible unless the suspect is specifically informed of certain rights, such as the right to remain silent and the right to consult with an attorney, and he decides to freely forego those rights. *See New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). A suspect is entitled to *Miranda* warnings, however, only if he is interrogated while in custody. *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir.1998). Here, it is undisputed that petitioner was "in custody" for purposes of *Miranda* at the time he gave the statements in question. Moreover, it

is undisputed that the detectives began speaking with petitioner before he was given his *Miranda* warnings. Nevertheless, petitioner's claim for *habeas* relief fails for three reasons.

■ First, it is not clear whether, under the Supreme Court's decision in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the comments of Detectives Santos and Ledee directed to petitioner when he was first brought into the 34th Precinct interview room on October 16, 1991 constituted "interrogation." For purposes of this petition, however, I will assume that the detectives' statements informing petitioner that his fingerprint had been found at the Isham Avenue apartment and recommending that he tell the officers who he was with if he wanted to avoid taking sole blame for the crime constituted interrogation.

Second, even assuming that the detectives' initial comments to petitioner constituted interrogation, petitioner did not make any statements in response to those comments. Rather, Detectives Santos and Ledee decided to give petitioner some time alone to think about what they said and promptly left the room. Upon reentering the room a few minutes later, the detectives administered *Miranda* warnings to petitioner in Spanish. Petitioner waived his rights, and the detectives began their interrogation in earnest. Hence, it was the subsequent interrogation of petitioner—that commenced after petitioner was given *Miranda* warnings—that produced the incriminating statements from petitioner in which he confessed to having participated in the robbery at the Isham Avenue apartment.

Petitioner argues that, even though he made no statements in response to the initial, pre-*Miranda* interrogation by the detectives, the statements he made after he was given the warnings should be suppressed because they were tainted by the initial pre-*Miranda* questioning. This contention is without merit.

In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court considered virtually this identical issue and held that a confession made after *Miranda* warnings are given is not automatically suppressible merely because such a confession is preceded by an earlier confession that was made prior to the administration of *Miranda* warnings. *Id.* at 309, 105 S.Ct. 1285. There, the defendant, a burglary suspect, had made incriminating statements to police officers when apprehended in his home before the officers administered *Miranda* warnings. The officers subsequently escorted the defendant to the Sheriff's headquarters and, approximately one hour later, advised of defendant of his *Miranda* rights for the first time. The defendant indicated that he understood his rights, but then expressly waived them and spoke to the officers. At that time, the defendant gave a full statement implicating himself in the burglary. *Id.* at 300–02, 105 S.Ct. 1285.

The defendant moved to suppress both the pre- and post-*Miranda* statements prior to trial. The motion was granted as to the pre-*Miranda* statements, but denied as to the post-*Miranda* statements. *Id.* at 302, 105 S.Ct. 1285. Upon review, the Supreme Court held that, while *Miranda* required that the unwarned statements be suppressed, the admissibility of the statements elicited after *Miranda* warnings were administered turned not on whether they were the unlawful "fruit" of the earlier, unwarned interrogation, but rather, on whether the initial statements were elicited through coercive means, thereby rendering the subsequent, post-*Miranda* statements involuntary. *Id.* at 309, 105 S.Ct. 1285. The Court stated as follows:

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a

subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

. . . . .

. . . We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 309, 314, 105 S.Ct. 1285. Thus, the Court rejected the defendant's contention that *Miranda* requires automatic suppression of all statements that follow unwarned interrogation. *See also Rollins v. Leonardo,* 733 F.Supp. 763, 765–66 (S.D.N.Y.1990) (applying *Elstad* and rejecting petitioner's argument that "if [his] first confession was improperly obtained, his second confession was tainted and therefore inadmissible"), *aff'd,* 938 F.2d 380 (2d Cir.1991), *cert. denied,* 502 U.S. 1062, 112 S.Ct. 944, 117 L.Ed.2d 114 (1992).

Under *Elstad,* then, petitioner is not automatically entitled to suppression of the statements he made to detectives after he was advised of the *Miranda* warnings simply because the initial questioning of him commenced before *Miranda* warnings were administered. Rather, the admissibility of petitioner's post-*Miranda* statements turns on whether the circumstances surrounding the detectives' initial questioning of petitioner "were so coercive as to prevent him from making a subsequent

knowing and voluntarily waiver of his rights, thereby requiring the suppression of his . . . warned confession." *Tankleff,* 135 F.3d at 244. This inquiry is governed by the "voluntariness" test, which will be addressed below.

█ Finally, even assuming that admission of petitioner's initial statements constituted error under *Miranda,* any such error was harmless. *See Rollins v. Leonardo,* 938 F.2d 380, 382 (2d Cir.1991) (per curiam) (approving district court's application of harmless error analysis to *Miranda* violation), *cert. denied,* 502 U.S. 1062, 112 S.Ct. 944, 117 L.Ed.2d 114 (1992); *see also Arizona v. Fulminante,* 499 U.S. 279, 306–12, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (applying harmless error analysis even to coerced confession). Petitioner's initial confession to Detectives Santos and Ledee was only the first among many. Indeed, petitioner gave several more confessions while he was in custody, all of which were preceded by the administration of *Miranda* warnings. With each confession, petitioner revealed new information to the detectives, culminating in a full, videotaped confession in which he admitted to being involved in all four incidents. In addition, petitioner was positively identified by witnesses as one of the perpetrators in three separate line-ups. Thus, there was ample evidence of petitioner's guilt, and admission of his initial confession, if erroneous, was harmless.

For all of the above reasons, petitioner is not entitled to *habeas* relief on the ground that his initial confession was obtained in violation of *Miranda.*

### 2. *Claim that the Initial Statements Were Involuntary*

█ Next, petitioner contends that, putting aside the question of whether his initial confession was obtained in violation of *Miranda,* his initial statements should still have been suppressed because they were the product of police coercion and were therefore involuntary. Even where

*Miranda* warnings have properly been administered, a confession may still nevertheless be suppressed if it was not given voluntarily. The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 3. "[I]n our accusatory system of criminal justice, the government by its own efforts must unearth the evidence against a suspect and may not procure it from the accused against his will." *Green v. Scully,* 850 F.2d 894, 900 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). Thus, "only those statements a suspect makes 'in the unfettered exercise of his own will' may be used against him, and a confession is voluntary only when it is 'truly . . . the product of his free choice.'" *Id.* (quoting *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) and *Miranda,* 384 U.S. at 458, 86 S.Ct. 1602). A confession is not the product of free choice, however, when "brought about by circumstances that caused the petitioner's will to be overborne at the time he confessed." *Id.*

▇▇▇ Whether a confession is voluntary is "a legal question requiring independent federal determination." *Fulminante,* 499 U.S. at 287, 111 S.Ct. 1246. Subsidiary factual questions underlying a legal determination, however, are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Diaz v. LeFevre,* 688 F.Supp. 945, 948 (S.D.N.Y.1988); *see also Smith v. Senkowski,* No. 97 Civ. 1280, 1999 WL 138903, at *7 (E.D.N.Y. Mar. 10, 1999); *Gagne v. Coughlin,* 995 F.Supp. 268, 274 (E.D.N.Y.1996) ("[R]esolutions of factual disputes by the state trial court judge are usually entitled to a presumption of correctness under 28 U.S.C. § 2254(d)."), *aff'd,* 129 F.3d 254 (2d Cir. 1997). In determining of whether a confession is voluntary, a federal court should consider the totality of the circumstances. *Tankleff,* 135 F.3d at 244–45; *see also Green,* 850 F.2d at 901 ("No single criterion controls whether an accused's confes-

sion is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances."). "In applying the totality of the circumstances test, the pertinent factors which merit consideration are '(1) the characteristics of the accused, (2) the conditions of [the] interrogation, and (3) the conduct of [the] law enforcement officials.'" *Pou v. Keane,* 977 F.Supp. 577, 583 (N.D.N.Y.1997) (quoting *Green,* 850 F.2d at 901–02). In connection with the third factor, whether a suspect has been advised of his rights under *Miranda* is an important consideration in determining whether a confession is voluntary. *See Davis v. North Carolina,* 384 U.S. 737, 740–41, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

▇▇▇ With these factors in mind, I conclude that the circumstances surrounding petitioner's initial admissions to the detectives were not so coercive as to render these admissions involuntary. First, the conditions under which the initial interrogation was conducted were not coercive. The record gives no indication that the initial interrogation of petitioner involved physical or psychological coercion. To the contrary, the record reveals that when the detectives confronted petitioner at his apartment, petitioner was not placed under arrest. Rather, petitioner voluntarily accompanied the detectives to the station house, and, accordingly, he was not handcuffed. Moreover, only two detectives, Santos and Ledee, were present in the interview room with petitioner at the time he was interrogated, and it appears from the record that the questioning of petitioner did not last long. Indeed, the pre-*Miranda* portion of the interrogation lasted only long enough for the detectives to tell petitioner that his fingerprint had been found at one of the crime scenes and that he should disclose who he had been with to avoid taking sole blame for the crimes committed. The detectives thereafter left the room. Upon returning, Detective Santos immediately administered *Miranda*

warnings to petitioner in Spanish. Finally, the record reveals that petitioner remained unhandcuffed throughout the period of time during which he was being questioned in the interview room.

Second, the conduct of the detectives conducting the questioning of petitioner was not coercive. There is no indication in the record that the detectives were abusive toward petitioner in their questioning of him. As noted, the detectives only spoke to petitioner briefly during the pre-*Miranda* phase. As for the post-*Miranda* questioning, the record reveals that, after reading petitioner his rights, Detective Santos merely reiterated what he had said previously—that petitioner's fingerprint had been found at a crime scene and that petitioner should reveal who was with him to avoid taking sole responsibility—and petitioner chose thereafter to waive his rights and cooperate with the detectives. This conduct was not coercive.

Numerous courts have held that confronting a suspect with the evidence against him does not render the resulting statements coercive or involuntary, even where, unlike here, dishonesty or misrepresentation is employed as a means to elicit the statements. *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 737–38, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (officer's misrepresentation that an associate confessed to the crime insufficient to render defendant's confession involuntary); *Ledbetter v. Edwards,* 35 F.3d 1062, 1069 (6th Cir. 1994) (police misrepresentation of evidence against suspect held not coercive), *cert. denied,* 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995); *Guam v. Muna,* 999 F.2d 397, 400 (9th Cir.1993) (informing suspect that co-defendant and another individual implicated him in crime held not coercive). Moreover, even if the detectives' advice to petitioner to reveal the names of his accomplices to protect himself

could be construed as a promise of leniency in exchange for cooperation, the Second Circuit has specifically stated that "the presence of a direct or implied promise of help or leniency alone [does] not bar[ ] the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision." *Green,* 850 F.2d at 901. Hence, in view of the totality of the circumstances, the detectives' conduct was entirely appropriate, and, indeed, there is nothing in the record to support a finding that the detectives' conduct prevented petitioner from freely and intelligently waiving his rights and agreeing to speak to the detectives.[2]

Finally, the characteristics of petitioner himself, such as his physical and mental condition, support a conclusion that his initial statements were made voluntarily. Petitioner was 32–years–old at the time, and therefore fully capable of choosing for himself whether to waive his *Miranda* rights. Moreover, there is no evidence in the record to suggest that he suffered from any physical or emotional condition that would have impeded his ability to make a knowing, intelligent, and voluntary waiver of his rights.

I conclude that, in light of the totality of the circumstances, the conditions under which petitioner made his initial confession to Detectives Santos and Ledee were not unduly coercive and that petitioner's initial confession to the detectives was therefore voluntary. Accordingly, petitioner is not entitled to a writ of *habeas corpus* on the ground that his initial confession was involuntary.

**B. Claims With Respect to Statements Made at the 20th Precinct**

Petitioner's claims with respect to the remaining statements made at the 20th Precinct are also without merit. Petitioner does not contend that the particular

---

**2.** I note that the administration of *Miranda* warnings and all questioning of petitioner were performed in petitioner's native language, Spanish. This fact further suggests

that petitioner understood his rights fully and knowingly and voluntarily waived those rights.

circumstances surrounding the making of those statements were coercive; rather, he contends that the coercive atmosphere under which petitioner's initial statements were made spilled over to all subsequent interactions between petitioner and the police and therefore tainted all subsequent statements made by petitioner. Because I conclude that the initial statements at the 34th Precinct were made voluntarily and of petitioner's free will, petitioner's contention that the coercion surrounding these initial statements tainted all subsequent statements must fail.

■ Even assuming, however, that the initial statements were the product of coercion, the remaining statements would still have been admissible against petitioner. When the circumstances surrounding an interrogation are coercive and the resulting statements by a defendant are determined to be involuntary, "the appropriate inquiry in determining the admissibility of [the defendant's] subsequent statements to [law enforcement officers] is whether the 'coercion surrounding the first statement had been sufficiently dissipated so as to make the second statement voluntary.'" *United States v. Perdue*, 8 F.3d 1455, 1467 (10th Cir.1993) (quoting *Leon v. Wainwright*, 734 F.2d 770, 773 (11th Cir.1984)); *see also Darwin v. Connecticut*, 391 U.S. 346, 349, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968). For the statements to be found voluntary, the prosecution must show "intervening circumstances which indicate that the second confession was 'insulate[d] ... from the effect of all that went before.'" *Id.* (quoting *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)). "The later confession will be admissible while the first will not 'only if such a distinction is justified by a sufficiently isolating break in the stream of events.'" *Id.* at 1467–68 (quoting *Leon*, 734 F.2d at 772).

■ Here, there is ample evidence in the record to support a finding that any assumed coercion surrounding the initial statements had dissipated by the time the subsequent statements were made. I will address each of the challenged groups of statements in turn.

**1. *Petitioner's Confession in the 20th Precinct Interview Room***

Petitioner's second confession, made in the interview room at the 20th Precinct, in which he confessed again to the crime at the Isham Avenue apartment and also confessed to an additional crime, was made after petitioner had been Mirandized for the second time and had again waived those rights. Furthermore, this round of questioning took place two hours after the initial questioning. Accordingly, any assumed coercion surrounding petitioner's initial statements had been "sufficiently dissipated so as to make the second statement voluntary." *Perdue*, 8 F.3d at 1467.

**2. *Petitioner's Spontaneous Statements to Officer Suarez and Detectives Rivera and Savino***

Petitioner's statements to officer Suarez during the line-up and his independent statements to detectives Rivera and Savino in the coffee room were also properly admitted against petitioner at trial because these statements were not made in response to any questioning at all by law enforcement officers, but rather were made by petitioner spontaneously. Accordingly, these statements were voluntary. *Cf. Diaz*, 688 F.Supp. at 948 (finding adequate support in state court record for trial court's finding that statement in question was "spontaneous statement made by ... defendant not in response to any questions" and holding that such statement was therefore voluntary).

**3. *Petitioner's Videotaped Confession***

Finally, there was adequate support in the record that petitioner's videotaped confession was voluntary. Prior to making this particular confession, the assistant district attorney conducting the interview had administered *Miranda* warnings to peti-

tioner in Spanish for the third time and petitioner had yet again waived his rights. In addition, petitioner gave the videotaped statement approximately sixteen hours after the initial interview conducted by Detectives Santos and Ledee. Finally, the videotaped statement was obtained at a different station house, and the questioning was conducted by a different law enforcement officer who made no reference to the earlier interrogation or the earlier statements made by petitioner and gave petitioner no indication that she was even aware of these earlier events. Under these circumstances, it is clear that even if the initial statements were obtained through coercive means, any assumed coercion surrounding petitioner's initial statements had sufficiently dissipated by the time petitioner gave his videotaped confession. Accordingly, I hold that the videotaped confession was also given voluntarily.

Because I find that petitioner's subsequent confessions given at the 20th Precinct station house were not in any way "tainted" by his initial confession at the 34th Precinct, this claim for *habeas* relief is also rejected.

### C. *Certificate of Appealability*

■ As petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c), as amended by the Antiterrorism and Effective Death Penalty Act of 1996. *See generally Lozada v. United States,* 107 F.3d 1011, 1017 (2d Cir.1997); *see also Rodriquez v. Scully,* 905 F.2d 24, 24 (2d Cir. 1990) (per curiam); *Alexander v. Harris,* 595 F.2d 87, 90–91 (2d Cir.1979). This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

### CONCLUSION

For the foregoing reasons, petitioner's application for a writ of *habeas corpus* is denied. The petition is dismissed and a certificate of appealability will not issue.

SO ORDERED.